764 F.2d 637
 In re SWINE FLU PRODUCTS LIABILITY LITIGATION.
Monte SANBORN, Plaintiff-Appellant,
v.
UNITED STATES of America; and Wyeth Laboratories, Inc., a
New York corporation doing business in Idaho,
Defendants-Appellees.
 No. 84-4082.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 4, 1985.
Decided June 25, 1985.
 
 Randolph E. Farber, Boise, Idaho, for plaintiff-appellant.
 Cathy R. Silak, Boise, Idaho, for defendants-appellees.
 Appeal from the United States District Court for the District of Idaho.
 Before HUG, FARRIS, and BOOCHEVER, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 Monte Sanborn appeals the grant of summary judgment in the District Court of Idaho, Callister, J., in which the district court found that Sanborn's wrongful death claim was time-barred. Sanborn had brought a Federal Tort Claims Act wrongful death and survival action against the United States and Wyeth Laboratories, the administrator and the manufacturer of the swine flu vaccine which allegedly resulted in the death of Sanborn's wife. See 28 U.S.C. Sec. 1346(b) and Sec. 2671. The district court dismissed both claims as time-barred; Sanborn appeals only the wrongful death claim.
 
 
 2
 Sanborn's wife Edna was vaccinated under the National Swine Flu Immunization Program in Idaho on or about December 12, 1976. The United States suspended the immunization program on December 16, 1976, after reports in the medical literature indicated a link between the vaccine and Guillain-Barre Syndrome, a rare neurological disease. Mrs. Sanborn died on January 4, 1977; an autopsy did not reveal the cause of death.
 
 
 3
 Apart from a single post-autopsy consultation with Dr. Donndelinger, the county coroner who supervised the autopsy, Sanborn took no steps to discover the cause of his wife's death until August 1979, when he then read a magazine article describing a link between the swine flu vaccination and GBS. In January 1980, he read a second article in his local newspaper describing a suit brought by a woman who had allegedly contracted GBS after receiving the swine flu vaccine. On May 2, 1980, Sanborn filed an administrative claim with the U.S. Public Health Service; he subsequently brought suit in federal district court.
 
 
 4
 The district court dismissed Sanborn's claim on two grounds. The court held that a FTCA wrongful death claim "accrues" on the date of death; Sanborn's failure to bring his claim within two years of January 4, 1977 meant that it was barred by the FTCA's two-year statute of limitations. See 28 U.S.C. Sec. 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues.") Alternatively, the court found that even if the medical malpractice "discovery rule" governed, Sanborn's claim was barred for failure to bring suit within two years of the time that he knew, or in the exercise of reasonable diligence should have known, of his wife's injuries and their cause.
 
 
 5
 Sanborn timely appeals; we have jurisdiction under 28 U.S.C. Sec. 1291.
 
 
 6
 I. Standard of review.
 
 
 7
 The district court's grant of summary judgment, based on a finding that Sanborn's claim was barred by 28 U.S.C. Sec. 2401(b), must be reviewed de novo. Raddatz v. United States, 750 F.2d 791, 795 (9th Cir.1984). "[W]here the issue of limitations involves determinations [of when a claim begins to accrue], summary judgment cannot be granted unless the evidence is so clear that there is no genuine factual issue...." Lundy v. Union Carbide Corp., 695 F.2d 394, 397-98 (9th Cir.1982) (quoting Williams v. Borden, Inc., 637 F.2d 731, 738 (10th Cir.1980)).
 
 
 8
 Timely compliance with Sec. 2401(b) is a jurisdictional prerequisite. Fernandez v. United States, 673 F.2d 269, 271 (9th Cir.1982); Blain v. United States, 552 F.2d 289, 291 (9th Cir.1977). Federal rather than state law controls when the statute of limitations accrues for a personal injury action brought under the Federal Tort Claims Act. See, e.g., Poindexter v. United States, 647 F.2d 34, 36 (9th Cir.1981).
 
 
 9
 II. The applicable accrual rule for Sanborn's wrongful death claim.
 
 
 10
 We first decide whether Sanborn's claim "accrued" 1) at the time of his wife's death, or 2) at the time when he discovered, or in the exercise of reasonable diligence should have discovered, both the injury and the cause of his wife's death. There is general agreement that a medical malpractice claim does not accrue under the FTCA until the plaintiff discovers, or reasonably should have discovered, his injury and its causes. United States v. Kubrick, 444 U.S. 111, 120 n. 7, 100 S.Ct. 352, 358 n. 7, 62 L.Ed.2d 259 (1979) (citation of cases); Waits v. United States, 611 F.2d 550, 552 (5th Cir.1980); Kossick v. United States, 330 F.2d 933 (2d Cir.), cert. denied, 379 U.S. 837, 85 S.Ct. 73, 13 L.Ed.2d 44 (1964); Quinton v. United States, 304 F.2d 234 (5th Cir.1962). The Circuits are, however, split on whether the medical malpractice discovery rule should be extended to wrongful death claims under the FTCA. Compare Garrett v. United States, 640 F.2d 24, 26 (6th Cir.1981), and Young v. United States, 184 F.2d 587, 588 (D.C.Cir.1950), and Gallick v. United States, 542 F.Supp. 188, 191 (M.D.Pa.1982) (swine flu wrongful death claim accrues at death), and Wolfenbarger v. United States, 470 F.Supp. 943 (E.D.Tenn.1979), and Pringle v. United States, 419 F.Supp. 289, 291 (D.S.C.1976), with Barrett v. United States, 689 F.2d 324, 327 (2d Cir.1982) (medical malpractice discovery rule appropriate in wrongful death case where plaintiff faces comparable problems in discerning fact and cause of injuries), cert. denied, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983), and Stoleson v. United States, 629 F.2d 1265, 1268 (7th Cir.1980); see also McGowan v. University of Scranton, 759 F.2d 287, 297 (3d Cir.1985) ("the compensatory goals of the tort system--the compensation of innocent victims and the deterrence of tortious conduct--are better served by applying the discovery rule in both [personal injury and survival actions]"); see generally Annot., Statute of Limitations Under Federal Tort Claims Act, 29 ALR Fed. 482 at Sec. 7 (1976 & 1984 Supp.) (discussing split in circuits).
 
 
 11
 We have never explicitly held that the discovery rule applies to a wrongful death action under the FTCA. However, we have noted that the discovery rule applies "in certain cases, usually involving medical malpractice or hidden injuries," and have performed a discovery rule analysis for a FTCA wrongful death claim. See Dyniewicz v. United States, 742 F.2d 484, 486-87 (9th Cir.1984). Furthermore, in "a wave of recent decisions" the courts have applied the discovery rule in non-FTCA claims to medical malpractice-based suits. See Restatement (Second) of Torts Sec. 899, Comment e, at 445 (1979), quoted in Kubrick, 444 U.S. at 121 n. 7, 100 S.Ct. at 359 n. 7. And in the only Supreme Court decision in the area, the Court has held that a medical malpractice claim brought under the FTCA accrues when the plaintiff learns or should reasonably have learned of both the injury and the cause of his affliction. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259; see also Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (applying discovery rule to claim under Federal Employers' Liability Act).
 
 
 12
 In all of these cases applying the discovery rule, the traditional tort rule that a claim accrues at the time of injury has been supplanted because "the nature of the tort itself and the character of the injury will frequently prevent knowledge of what is wrong, so that the plaintiff is forced to rely upon what he is told by the physician." Kubrick, 444 U.S. at 120 n. 7, 100 S.Ct. at 358 n. 7 (citation omitted); see Dyniewicz, 742 F.2d at 486; Barrett, 689 F.2d at 327; Davis v. United States, 642 F.2d 328, 330-31 (9th Cir.1981); Stoleson, 629 F.2d at 1269; Steele v. United States, 599 F.2d 823, 828 (7th Cir.1979). Joining the general trend toward applying the discovery rule in latent disease cases, these courts have recognized that a plaintiff who is "blamelessly ignorant of the existence or cause of his injury should be accorded the benefits of the more liberal accrual standard," Barrett, 689 F.2d at 327, since it is not until he learns of both the fact of injury and its cause that the malpractice plaintiff falls "on the same footing as any negligence plaintiff." Davis, 642 F.2d at 331; see also Kubrick, 444 U.S. at 124, 100 S.Ct. at 360.
 
 
 13
 The rationale of the medical malpractice discovery rule is fully applicable to Sanborn's wrongful death claim. On the date of Mrs. Sanborn's death the medical and general communities were still ascertaining whether a GBS victim even had any rights against the manufacturer and administrator of the swine flu vaccine. We do not ignore the traditional concerns that a claim be time-barred when "evidence has been lost, memories have faded, and witnesses have disappeared." Order of R.R. Telegraphers v. Railway Express Agency, 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944). But under these facts, fundamental fairness concerns must prevail. See Urie v. Thompson, 337 U.S. at 169-70, 69 S.Ct. at 1024-25.[1] We follow the suggestion of Kubrick and Dyniewicz, and apply the medical malpractice discovery rule to Sanborn's FTCA wrongful death claim.
 
 
 14
 III. When should Sanborn have reasonably discovered the cause of his wife's death?
 
 
 15
 The dispositive issue becomes whether Sanborn knew or should have reasonably discovered the cause of his wife's death prior to May 2, 1978--two years before he actually filed an administrative claim with the government. See 28 U.S.C. Sec. 2401(b). "The 'cause' is known when the immediate physical cause of the injury is discovered." Dyniewicz, 742 F.2d at 486 (citing Davis, 642 F.2d at 331). Because there is no evidence that Sanborn actually knew of the cause, the government's statute of limitations defense ultimately turns on whether Sanborn failed to exercise due diligence. "[W]hat constitutes due diligence is necessarily a case-by-case determination. For example, mere temporal proximity of the negligent act to the illness is not alone determinative." Mann v. A.H. Robins Co., 741 F.2d 79, 82 n. 2 (5th Cir.1984) (applying Texas law in Dalkon Shield case).
 
 
 16
 The question whether Sanborn should have reasonably discovered the cause of his wife's death will turn on two issues of fact. But because both issues are in dispute, we cannot say that "Plaintiff knew [or should have known] both the 'existence and the cause of [his] injury' at a time beyond the limitations bar." Gallick v. United States, 542 F.Supp. at 192 (applying standard for determining whether FTCA swine flu injury claim can be disposed of on summary judgment); Exnicious v. United States, 563 F.2d 418 (10th Cir.1977); Perkins v. United States, 76 F.R.D. 590 (W.D.Okl.1976).
 
 
 17
 A. Press reports in the general community.
 
 
 18
 The government notes that reports appeared in the medical literature in late 1976 and early 1977 connecting swine flu vaccinations with neurological problems, and that the vaccination program itself was suspended approximately one week after Mrs. Sanborn was inoculated. The suspension of the program was reported widely in the press, including in the December 17 and 18, 1976 issues of the Idaho Statesman, a newspaper servicing Sanborn's community. The government argues that because of these press reports, Sanborn should have "reasonably known" of the cause of his wife's death.
 
 
 19
 There are two difficulties with holding Sanborn, as a matter of law, to the alleged general community awareness. First, no record has yet been developed to indicate the extent to which Sanborn's immediate community in fact was made aware of the causal connection between the vaccine and GBS-like symptoms. Although Dr. Gabrielson, who treated Mrs. Sanborn while she was alive, was aware in early 1977 that the vaccination program had been suspended because of a possible connection to neurological disease, the county coroner himself was apparently sufficiently oblivious to the dangers of the vaccine that he did not advise Sanborn, when directly asked in February 1977, of a possible link to Mrs. Sanborn's death. The record reflects a genuine dispute over a material fact: the extent of community knowledge during the period Sanborn could properly have brought suit. See Ballew v. A.H. Robins Co., 688 F.2d 1325, 1327-28 (11th Cir.1982) (whether plaintiff knew or should have known about the causal connection is a question of fact for the jury, and when facts conflict on the extent of the plaintiff's actual knowledge, summary judgment should be reversed).
 
 
 20
 Even if the facts indisputably demonstrate some community awareness of the dangers underlying the swine flu program, we have recently held that a series of press releases, accompanied by "Dear Doctor" letters to over 200,000 physicians, did not put a plaintiff who had suffered injuries arising out of her use of the Dalkon Shield intrauterine device on notice for purposes of the discovery rule. See Allen v. A.H. Robins, 752 F.2d 1365, 1370-71 (9th Cir.1985). We instead found accrual on the date when the plaintiff viewed a "60 Minutes" program which discussed the Dalkon Shield's dangers. Sanborn cannot be held accountable as a matter of law for press accounts in late 1976 or 1977. See also McGowan v. University of Scranton, 759 F.2d at 303 (reversing grant of summary judgment when unclear whether press reports on "toxic shock syndrome" should reasonably have led to plaintiff's discovery of cause of her infection); O'Brien v. Eli Lilly & Co., 668 F.2d 704, 710 (3d Cir.1982) (claim accrued when plaintiff actually read articles indicating link of diethylstilbestrol to cancer). Additional fact-finding is necessary to determine whether the general community awareness was sufficient to find that Sanborn should reasonably have known of the cause of his wife's death.
 
 
 21
 B. The county coroner's assurances.
 
 
 22
 Sanborn avers that when he asked the county coroner whether the swine flu vaccine could have contributed to his wife's death, the coroner--who had not personally performed the autopsy--told him that any symptoms would have appeared immediately after the inoculation and would not have been delayed as long as they had been in Mrs. Sanborn's case. Furthermore, the coroner suggested that Mrs. Sanborn's long history of tranquilizer use, her weakened heart, and a possible viral infection led to her death. Sanborn argues that a "reasonable person" would have been discouraged, as he was, from inquiring any further; the government contends that a reasonable person would have consulted other medical or legal personnel, particularly when the autopsy did not disclose the cause of death.
 
 
 23
 Several circuits have suggested that "where a claimant is given a 'credible explanation' of his condition not pointing to malpractice, he may not be found to have failed to exercise reasonable diligence because he did not earlier pursue his claim." Exnicious v. United States, 563 F.2d at 421, 424 (citing Jordan v. United States, 503 F.2d 620, 624 (6th Cir.1974)); see Allen v. A.H. Robins, 752 F.2d at 1371 (patient may reasonably rely on doctor's assurances that symptoms are a normal consequence of condition that does not require treatment) (citing Raddatz v. United States, 750 F.2d 791, 796 (9th Cir.1984)); Lundy v. Union Carbide Corp., 695 F.2d 394, 397 (9th Cir.1982) (under Oregon law, plaintiff could not reasonably have known that his lung scarring was caused by asbestos exposure, when physician rejected plaintiff's suspicions and suggested other causes of the disease); Ballew v. A.H. Robins Co., 688 F.2d 1325, 1328 (11th Cir.1982). Whether Sanborn acted reasonably in failing to make additional inquiries is a genuine issue of material fact.
 
 
 24
 The government also argues that the coroner was never informed of Mrs. Sanborn's symptoms and thus could not have been expected to connect them with the vaccine. This contention merely underscores the existence of the issue. Whether Sanborn had reason to know that the coroner was ignorant of Mrs. Sanborn's physical condition and withheld discussion of her symptoms, or whether Sanborn merely relied on the knowledge which one would naturally presume the coroner to possess in discussing a particular autopsy, is an issue that can only be resolved after additional fact-finding.[2]
 
 
 25
 It is disputable whether Sanborn should reasonably have discovered the causal connection between the vaccine and his wife's death. Because this issue is one of fact for the jury, Ballew, 688 F.2d at 1327; Lundy v. Union Carbide Co., 695 F.2d at 398, summary judgment should not have been granted.
 
 IV. Conclusion
 
 26
 The Supreme Court in Kubrick and our own jurisprudence suggest that the medical malpractice discovery rule must govern Sanborn's FTCA wrongful death claim.
 
 
 27
 Under the discovery rule, the dispositive issue is whether Sanborn knew or should reasonably have discovered the cause of his wife's death within two years of filing his claim with the government. There is a factual dispute over the extent of general community awareness of the link between the swine flu vaccine and GBS. This community awareness may or may not be sufficient to charge Sanborn with knowledge of the causal connection. In addition, the county coroner's assurances that the inoculation did not cause Mrs. Sanborn's death, and that other causes may instead have been at work, raise an issue of material fact whether Sanborn should have reasonably discovered the cause of his wife's death within the limitations period.
 
 
 28
 REVERSED.
 
 
 
 [1]
 See also Note, The Fairness and Constitutionality of Statutes of Limitations for Toxic Tort Suits, 96 Harv.L.Rev. 1683, 1684-90 (1983)
 
 
 [2]
 The government also argues that because Dr. Gabrielson, who treated Mrs. Sanborn prior to her death, was aware of a possible link between GBS and neurological disease, Sanborn "should have" questioned Dr. Gabrielson, since he would then have learned the probable cause of his wife's death. This argument misconstrues the "should have reasonably known" standard, which looks not to the likelihood that a plaintiff would in fact have discovered the cause of his injury if he had only inquired, but instead focuses on whether the plaintiff could reasonably have been expected to make the inquiry in the first place