**Monte SANBORN, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. No. 80–1308.**

United States District Court, D. Idaho.

March 20, 1987.

Randolph E. Farber, Nampa, Idaho, for plaintiff.

Cathy R. Silak, Special Asst. U.S. Atty., Boise, Idaho, and Brenda M. Green, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

### MEMORANDUM DECISION

CALLISTER, Chief Judge.

This is a Federal Tort Claims Act (FTCA) case brought by plaintiff Monte Sanborn.

He claims that his wife died as a result of receiving a Swine Flu vaccination. A court trial was held on the sole issue of whether Monte Sanborn's claim was barred by the statute of limitations. The Court requested post-trial briefing and proposed findings of fact and conclusions of law. Those materials have now been received and the matter is at issue. Pursuant to Fed.R. Civ.P. 52, the Court hereby makes the following findings of fact and conclusions of law.

Monte Sanborn filed his complaint in this action on November 18, 1980. The Court has jurisdiction over that complaint pursuant to the FTCA, 28 U.S.C. § 1346(b) and the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b.

Monte Sanborn's wife, Edna, was vaccinated under the Swine Flu Immunization Program in Idaho on December 12, 1976. Four days later, on December 16, 1976, the Government suspended the immunization program after discovering a possible link between the vaccine and Guillain-Barre Syndrome (GBS), a rare neurological disease. Edna Sanborn died on January 4, 1977; an autopsy did not reveal the cause of her death.

The autopsy report, Exhibit 13, shows that the cause of death is "unknown." The chief coroner was Dr. Thomas M. Donndelinger. He sent his deputy, Charles McCarty, to investigate Mrs. Sanborn's death and obtain her medical history from Monte Sanborn and her treating physician, Dr. Gabrielsen. The history given by Monte Sanborn to McCarty is contained in Exhibit 12. That history, as related by McCarty, is as follows:

Had been sick all night—urinary problems. S.O.B. Sick one week—worse last Wed. Then worse yesterday. Daughter just over hepatitis. Found lying on back besides bed—had been incontinent urine. Ambulance called. No response.

In addition, Exhibit 12 summarized her treatment history:

Saw Dr. Gabrielsen 1/3/77 09:00. Had cancer 11 years ago. Migraine headaches. Had bowel obstruction 1975.

This is quite a different medical history from that given by Monte Sanborn when he filed his administrative claim on April 29, 1980. That claim, set forth in Exhibit 11, indicates that just before her death, Edna Sanborn suffered from "weakness, pain in the groin area and upper leg, became unable to stand up straight." Dr. Donndelinger testified that if he had been told that Edna Sanborn suffered from weakness and an inability to stand up straight after receiving the vaccination, the autopsy would have been done differently and he would have checked for neurological problems.

Dr. Donndelinger had two conversations with Monte Sanborn just after the autopsy. In those conversations, Monte Sanborn asked Dr. Donndelinger whether the Swine Flu vaccination could have caused Edna Sanborn's death. Dr. Donndelinger testified that he did not have a specific recollection of the conversation but he did recall discussing a possible correlation between the Swine Flu shot and Edna Sanborn's death.

Monte Sanborn testified that Dr. Donndelinger told him that the cause of Edna Sanborn's death could not be determined but it may have stemmed from a combination of drugs and a virus that weakened her heart. In addition, Monte Sanborn testified that Dr. Donndelinger told him that the Swine Flu shot probably did not cause Edna Sanborn's death because too much time elapsed between the shot and her demise. Although Dr. Donndelinger could not specifically recall the details of these conversations, he testified that they could have occurred according to Monte Sanborn's testimony.

Monte Sanborn further testified that it was not until August 1979 that he had reason to question Dr. Donndelinger's analysis. He testified that in that month in read a magazine article describing a case where a Swine Flu vaccinatee sustained injury which manifested itself more than twenty days after receiving the shot. Monte Sanborn claims this is the first indication he had that Dr. Donndelinger's statement on the incubation period of GBS was erroneous. In January 1980, Monte

Sanborn read newspaper articles discussing a lawsuit filed by Leona Lannigan against the United States for injuries received from the Swine Flu vaccination. Thereafter, Monte Sanborn contacted attorneys and filed his administrative claim on April 29, 1980.

One of the central factual issues in this case concerns the general community awareness of the link between the vaccine and GBS symptoms. Monte Sanborn testified he subscribed to and read the *Idaho Free Press and News Tribune*. Exhibit 1 shows numerous articles in that newspaper discussing the correlation between the Swine Flu vaccine and GBS. Articles indicating that some people had died following vaccinations occurred as early as October 12, 1976. A front-page news article on that date stated: "Elderly citizens' deaths prompt Swine Flu probe." Another front-page headline the next day, October 13, 1976, reads: "Officials say flu vaccine safe: Some states still uncertain." On December 30, 1976, a headline stated: "Paralysis fears drill Swine Flu program."

These and other articles discuss possible links between the vaccine and various deaths or incidents of GBS. Monte Sanborn testified that he was aware of problems with the Swine Flu vaccine, and that he had read about the program being suspended because some had died and others became paralyzed.

In addition to these newspaper articles, the Government submitted other evidence bearing on the community knowledge issue. Dr. Charles Reed, an internist practicing in Caldwell, testified that shortly after the suspension of the vaccination program, eight to ten vaccinatees came into his Caldwell office with knowledge about a possible link between the vaccine and GBS and with a desire to know more. Dr. Roger Curran, a neurologist practicing in Nampa, testified that he had a few patients indicate that they had heard about the vaccine-GBS link though the media. Lawrance Lange, a paralegal with the Department of Justice, testified that Idaho residents filed twenty-two administrative claims under the Swine Flu Act. Seven of these claims were filed by residents of the Nampa/Caldwell area. All of these seven claims, except Sanborn's, were filed in 1977 or 1978, a persuasive indicator that the community was aware during 1977 and 1978 of the health risks associated with the vaccine. Patricia Herbel, a nurse at the Kaley Clinic where Edna Sanborn was vaccinated, testified that the Clinic received several calls from the public about the shutdown of the Swine Flu Program and the vaccination's link to GBS.

## CONCLUSIONS OF LAW

This action is governed by the Swine Flu Act, which, in turn, incorporates the provisions of the FTCA. *See* 42 U.S.C. § 247b(k)(2)(A). The applicable FTCA statute of limitations is contained at at 28 U.S.C. § 2401(b) which provides that a tort claim against the Government is barred unless an administrative claim is brought within two years "after such claim accrues." Monte Sanborn filed his administrative claim on May 2, 1980. The issue in this case is whether his administrative claim "accrued" prior to May 2, 1978.

To resolve this issue, the Court is guided by the Ninth Circuit's decision in *Sanborn v. United States*, 764 F.2d 637 (9th Cir. 1985). This Court had earlier granted summary judgment in favor of the Government on the statute of limitations question. The Ninth Circuit reversed that decision holding that questions of fact existed. The Ninth Circuit held that:

> The dispositive issue becomes whether Sanborn knew or should have reasonably discovered the cause of his wife's death prior to May 2, 1978.... The cause is known when the immediate physical cause of the injury is discovered. Because there is no evidence that Sanborn knew of the cause, the Government's statute of limitations defense ultimately turns on whether Sanborn failed to exercise due diligence. What constitutes due diligence is necessarily a case-by-case determination. For example, mere temporal proximity of the negligent act to the illness is not alone determinative.

The question whether Sanborn should have reasonably discovered the cause of

his wife's death will turn on two issues of fact. (Citations omitted.)

*Id.* at 640.

The two issues of fact identified by the Ninth Circuit are as follows:

1. Whether the general community awareness of the link between the vaccine and GBS was sufficient to find that Monte Sanborn should reasonably have known of the cause of his wife's death prior to May 2, 1978;

2. Whether the county coroner's assurances that the innoculation did not cause Edna Sanborn's death and that other causes may instead have been at work reasonably led Monte Sanborn to not inquire further concerning the cause of his wife's death.

■ In this case, the Court finds that the community knowledge was sufficient to find that Monte Sanborn should reasonably have known of the cause of his wife's death prior to May 2, 1978. The testimony of Dr. Reed, Dr. Curran, and Pat Herbel, detailed earlier, shows that many people in the Caldwell/Nampa area were aware that the Swine Flu vaccination was linked with serious health problems. There were numerous articles in the *Idaho Free Press and News Tribune* discussing the occurrence of GBS and deaths following the vaccination. Monte Sanborn testified that he read about the deaths and paralysis associated with the vaccination. All of the administrative claims, filed by Nampa/Caldwell residents, except Monte Sanborn's, were made in 1977 and 1978. These facts show a pervasive community knowledge that there was some link between the Swine Flu vaccine and GBS and various deaths.

The second issue identified by the Ninth Circuit is whether Monte Sanborn was reasonably discouraged from inquiring further about his wife's death after receiving assurances from the county coroner that the vaccination did not cause her death. The Ninth Circuit cited with approval malpractice cases from other circuits holding that where a claimant is given a credible explanation of his condition not pointing to malpractice, he may not be found to have failed to exercise reasonable diligence because he did not earlier pursue his claim.

■ The Court finds, however, that this case is not similar to those cited in the Ninth Circuit opinion. First, Monte Sanborn's own negligence was responsible for the county coroner's assurances. The Court finds that Monte did not tell the coroner about his wife's weakness and difficulty in standing, and also that these facts were not revealed to her treating physicians. Edna Sanborn had been seen by her principal treating physician, Dr. Gabrielsen, on January 3, 1976, one day prior to her death. At that time, Dr. Gabrielsen found no evidence of neurological disease, and Edna Sanborn had not described to him any symptoms that were consistent with neurological disease. As Dr. Gabrielsen stated in his deposition:

> It's inconceivable that a patient would be within hours of dying of a neurological disease and neither report to me any complaints about it or demonstrate any obvious findings.

*See* Deposition of Dr. Gabrielsen at p. 123, lines 20–23, Exhibit 16.

According to Monte Sanborn's own testimony, Edna's weakness was not a minor ailment easily forgotten or dismissed as trivial. The weakness was so bad at one point that Monte had to carry Edna around the house and into the car. Why this important symptom of weakness was never communicated to the county coroner or the treating physician is a mystery. But that fact remains that the assurances made by the county coroner were based on an incomplete medical history.

Under the circumstances of this case, Monte Sanborn was not diligent in his inquiries about Edna Sanborn's death. Monte Sanborn had his own suspicion that the vaccination caused his wife's death as evidenced by his questioning of Dr. Donndelinger on this very point. He knew of his wife's serious weakness. He should have been aware of the pervasive press reports on the vaccination's link with GBS and deaths. With this information he was unreasonable in failing to fully communicate his wife's symptoms to the county coroner. He was also unreasonable in simply accepting the county coroner's assurances. With the information he possessed in January

1977, Monte Sanborn should have been aware of his wife's injury and its probable cause. This cause of action therefore accrued prior to May 2, 1978, and the action is therefore time-barred.

### JUDGMENT

The Court has examined the entire record following court trial in this case and examined all materials submitted after that trial. In accordance with the views expressed in the memorandum decision accompanying this judgment,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the plaintiff take nothing by reason of his complaint against the defendant.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the defendant have judgment against the plaintiff for its costs incurred herein in a sum to be determined by the Clerk of Court after proper submission of cost bills.