Stephanie Zientek
**SHOSTACK, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

Civ. No. 83–1184.

United States District Court,
M.D. Pennsylvania.

Feb. 2, 1988.

Joseph J. Ustynoski, Hazleton, Pa., for plaintiff.

James W. Walker, Asst. U.S. Atty., Scranton, Pa., for defendant.

## MEMORANDUM AND ORDER

CONABOY, District Judge.

### PROCEDURAL HISTORY

On August 18, 1983, Plaintiff commenced this action against the United States of America pursuant to the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b. The Swine Flu Act established a national program of immunization for a disease popularly known as swine flu. In order to induce private companies to manufacture the needed vaccine, the United States substituted itself as the Defendant and assumed all liability for damages. In doing so, Congress incorporated as the remedy the provisions of the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Accordingly, a recipient of the vaccine claiming to have been injured would sue the United States instead of the manufacturer of the drug.

In her complaint, Plaintiff alleges that an administrative claim was properly filed with the appropriate agency on March 10, 1983, and that the claim was denied on April 18, 1983.

As a defense, the United States has raised the statute of limitations arguing that Plaintiff failed to file an administrative claim within two years after her cause of action accrued, as required by the Federal Torts Claim Act.

By agreement of the parties, the case was bifurcated and a trial was held to resolve the factual issue concerning the accrual date of the Plaintiff's injury for statute of limitations purposes. On February 2, 1987, the Court heard testimony on the statute of limitations issue. Additionally, the deposition of Dr. Ki Bum Lee was submitted for consideration. Thereafter, the parties filed briefs supporting their positions. This matter is ripe for disposition.

## SUMMARY OF TESTIMONY

The following testimony was heard by the Court. For the sake of clarity, the Court has rearranged the testimony of the witnesses.

### Testimony of Stephanie Zientek Shostack

Mrs. Shostack, the Plaintiff in this matter, testified that she received swine flu inoculations during the first week of November, 1976 and again two weeks later at the Laurel Mall in Hazleton, Pennsylvania. Approximately five weeks later, in early January, 1977, the Plaintiff became ill and consulted Dr. Albert Zogby, her family physician. Dr. Zogby treated the Plaintiff for 3 or 4 days at her home and advised her at the time that she was suffering from "the flu or grippe". The Plaintiff testified that on or about January 12, 1977, she encountered numbness in her fingers and toes, could not swallow, and had a sharp pain in her lower part of her back. As such, Dr. Zogby admitted Plaintiff on January 12, 1977 to St. Joseph's Hospital for treatment of what Plaintiff believed to be the flu.

The Plaintiff testified that she remained in the hospital for 58 days, during which time she had a weight loss of approximately 40 pounds; suffered a one-month period of paralysis on her right side; underwent a tracheostomy; at times was disoriented; and was placed on a respirator. However, the Plaintiff testified that during and after her hospitalization no one indicated to her that she was suffering from Guillain-Barre Syndrome or that the flu shots were diagnosed as the cause of her illness. Moreover, Plaintiff stated that she was not questioned about her inoculations. Additionally, the Plaintiff testified that she never inquired about her illness or its cause; instead, her only concern was to get well.

Following her discharge from the hospital, on March 8, 1977, the Plaintiff testified that she underwent a period of rehabilitation and had occasion to see Dr. Zogby twice. During the summer of 1977, Dr. Zogby indicated to Mrs. Shostack that she would be able to return to work. As a result, she accepted employment at the Sargent Art's Company in July, 1977, but left that position because she was unable to complete her first day on the job due to weakness. She testified that her inability to work caused her concern and made her wonder why she could not work the way in which she did before her illness. She further testified that her weakness even caused her to want to talk to Dr. Zogby about her condition, however, Dr. Zogby was deceased by that time. Mrs. Shostack also indicated that she never considered asking Dr. Corazza about her condition.

Mrs. Shostack testified that she did not make the connection between the flu shot and her illness and, for that matter, was unaware of the fact that she contracted Guillain Barre Syndrome until 1982. During the beginning of that year, her husband read in the paper that the Government was being sued by people who had received the swine flu shot, and had reactions to the inoculation similar to hers. The Shostacks contacted Attorney Ustynoski approximately two weeks later. Attorney Ustynoski obtained the Plaintiff's medical records. Plaintiff did not review or discuss the medical records with her lawyer before traveling to Philadelphia, Pennsylvania for a consultation with Dr. G.R. Haase. Dr. Haase reported Plaintiff as having told him that she had a tracheostomy, and a lumbar puncture "which told them what it was." Mrs. Shostack testified that it was Dr. Haase who told her for the first time that she had been afflicted with Guillain Barre Syndrome.

### Testimony of Dr. Leo Corazza

Dr. Corazza testified, via video deposition, that on July 16, 1977 Dr. Zogby requested that he examine Mrs. Shostack. Dr. Corazza indicated that his consultation record showed that his first impressions of Mrs. Shostack's symptoms were that either she had a spinal cord disease or, conversely, suffered from hysteria.

Dr. Corazza pointed out that on January 18, 1977, a spinal tap was performed on Mrs. Shostack for diagnostic purposes on orders of Dr. Zogby. Thereafter, several

other physicians involved the care of Mrs. Shostack examined the Plaintiff and the general diagnosis of those physicians was that Plaintiff suffered from Guillain Barre Syndrome caused by the inoculation.

Dr. Corazza indicated that prior to his treatment of Mrs. Shostack he had encountered patients with Guillain Barre Syndrome (GBS) on one or two occasions. Additionally, at the general time of Mrs. Shostack's illness, he was involved in the treatment of four individuals who had GBS. Dr. Corazza stated that he was aware that the Plaintiff had received a swine flu injection prior to her admission to the hospital, however, he was unsure of exactly how he came upon that information.

During this time-frame, Dr. Corazza understood that Guillain Barre Syndrome could result from various factors, one of which being a reaction from the swine flu inoculation.

Dr. Corazza testified that he agreed with the diagnosis made by Dr. Zogby that Mrs. Shostack had Guillain Barre Syndrome based on his examination and the lab studies and that it was a reaction to the influenza vaccine. Dr. Corazza testified that if Mrs. Shostack or any member of her family had asked him of his diagnosis of her illness and its causation, he would have opined that she had Guillain Barre Syndrome which resulted from the influenza inoculation.

Dr. Corazza indicated that following her discharge from the hospital, he did not have any further contact with Mrs. Shostack.

### Testimony of Dr. Ki Bum Lee

The deposition of Dr. Lee was submitted by the parties for the Court's review on the statute of limitation issue discussed herein.

Dr. Lee was the Plaintiff's treating obstetrician for a child which was delivered on or about October 21, 1978. Prior to the delivery Dr. Lee had occasion to see the Plaintiff on April 6, 1978 at his office. During the course of the visit Dr. Lee asked certain questions and made notes. In Dr. Lee's Clinical Record under a section entitled Progress Notes, the following notation appears in the left margin: "right side paralyzed after flu shot, 1977, hospitalized for three months with tracheostomy". Dr. Lee testified that the notation may be in the margin because it was added to the Progress Notes after his interview with Mrs. Shostack. The doctor testified that this information would have been initiated by the patient, but that it must have been confirmed with either the hospital or the initial treating physician since paralysis is important information in the obstretrics' field. The doctor indicated that he would have confirmed information regarding paralysis since anyone who was paralyzed as a result of stroke might present some danger of complications. The doctor was quite sure that Mrs. Shostack initiated the information that she was paralyzed, but could not testify whether she ever mentioned anything with regard to flu shots.

### Testimony of Ann Davis

The United States called as a witness Ann Davis, a nurse at St. Joseph's Hospital in Carbondale, Pennsylvania. Defendant's intent in calling Nurse Davis was to establish that Mrs. Shostack had indicated to her on or about October 21, 1981, that she had been paralyzed in 1977 as a result of an influenza shot and, therefore, knew of the cause of her illness at that time.

Nurse Davis testified that she first encountered Plaintiff when she was admitted to St. Joseph's Hospital in labor. Mrs. Davis admitted the Plaintiff to the labor room and took her vital signs, listened to fetal heart tones, and filled out a Nursing Data Base Sheet. Mrs. Davis testified that the Nursing Data Base Sheet is the patient's own personal record. The patient is generally asked about her allergies, her previous hospitalizations, and other illnesses that she may be experiencing at the time.

The data sheet filled out by Mrs. Davis includes under a section entitled "Previous Experience With Hospitalization" a quote reading "Hospitalized after flu shot in 1977. Right side was paralyzed, three months with tracheostomy". Mrs. Davis

testified that such information would emanate from the patient. She testified that the phraseology of the quote would have either been the direct answer from the patient, or she would have read what was on the OB history and if an affirmative answer was elicited, she would have then written it on the Prenatal Summary. Mrs. Davis testified that she does not recall whether the Plaintiff directly gave the information to her. In fact, Mrs. Davis admitted that the wording of the quote regarding Shostack's earlier hospitalization was similar to the wording in the Obstetrical Department's Prenatal Summary. However, Mrs. Davis stated that since obstetrical histories are not always correct, she would have read the language from the Prenatal Summary to Mrs. Shostack and would have then asked her if the information was accurate before copying any portion of the Prenatal Summary into the Data Sheet.

*STATUTE OF LIMITATIONS*

Under the Federal Torts Claim Act, a claim against the United States is barred unless it is presented to the appropriate federal agency "within two years after such claim accrues." 28 U.S.C. § 2401(b) (1982). The Plaintiff's claim, therefore, is time-barred if it accrued before March 10, 1981, two years before the date she filed the administrative claim.

Plaintiff avers that her claim accrued in March of 1982, when Dr. Haase indicated to the Plaintiff that her 1977 illness was Guillain Barre Syndrome caused by the swine flu shots which she received in November of 1976.

The United States contends that the Plaintiff's claim accrued by July, 1977. At this point, the Plaintiff stated that she was concerned and wondered about her inability to resume employment. Defendant maintains that she could have learned of the nature and cause of her illness from either Dr. Zogby (who did not die until 1979); Dr. Corazza; or any other physicians on her case, had she inquired. Alternatively, Defendant contends that the factual evidence demonstrates that Plaintiff knew the nature and cause of her illness as early as 1978, based upon the testimony of Dr. Ki Bum Lee and Nurse Davis.

The determination of when a claim accrues for the purposes of the FTCA is a question of federal law. *Zeleznik v. United States*, 770 F.2d 20, 22 (3d Cir.1985); *Tyminski v. United States*, 481 F.2d 257, 262–63 (3d Cir.1973). The FTCA is a limited waiver of the sovereign immunity of the United States. The Supreme Court has admonished that the Court should carefully construe the Statute of Limitations for the FTCA so as not to extend the limited waiver of sovereign immunity beyond that which Congress intended. *United States v. Kubrick*, 444 U.S. 111, 117–18, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979).

The Supreme Court in *Kubrick, supra*, noted that the purpose of the Statute of Limitations is to encourage the filing of claims promptly by giving no more than a reasonable time within which to make a claim. By limiting the period in which a claim may be made, the statute protects Defendants from having to defend actions where the truth-finding process is impaired by the passage of time. *See also Zeleznik, supra*, at p. 22.

The general rule in tort actions is that the cause of action accrues at the time of the last event necessary to complete the tort. Usually, this is at the time the Plaintiff is injured. *Kubrick*, 444 U.S. at 120, 100 S.Ct. at 358. It is clear, however, that an injured party cannot make a claim until he has or should have had notice that he has an action to bring. *Zeleznik, supra*, at p. 22. In that regard, the Supreme Court has carved an exception into the general rule commonly referred to as the "discovery rule". That rule holds that the accrual of a claim brought under FTCA would be delayed until the Plaintiff learns or should reasonably have learned of both the injury and the cause of the affliction. *Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259; *See also Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949); *In re Swine Flu Products Liability Litigation*, 764 F.2d 637 (5th Cir.1985).

Against this backdrop, this Court must decide whether prior to March 10, 1981 the

Plaintiff knew, or in the exercise of reasonable diligence could have learned that the flu shots caused her illness. In making this determination, the Court must decide whether the Plaintiff possessed sufficient critical facts to put her on notice of a possible invasion of her legal rights to require that she investigate. *Zeleznik*, at p. 23.

The first task is to determine whether the Plaintiff was aware of the nature and cause of her illness at any point before March 10, 1981. A review of the case establishes that there exists a handful of circumstances that would allow one to infer that the Plaintiff had actual knowledge of her ailment and its cause. For instance, clearly each of the doctors involved in this case (including the obstetrician) was aware that Plaintiff had Guillain Barre Syndrome and that the inoculation was the probable cause. This fact, coupled with the extreme severity of the illness, the length of the Plaintiff's hospitalization, the Plaintiff's overall concern regarding her health, and the seemingly improbable explanation given as to the the way in which she finally discovered her illness' cause, could indeed persuade a factfinder to determine that the Plaintiff knew that the swine flu shots caused her illness.

Weighing against this inference, however, is the direct testimony of Mrs. Shostack that she was never told (before her consultation with Dr. Haase in 1982) that she had Guillain Barre Syndrome. Improbable as the above proposition may seem, Mrs. Shostack appeared to the Court as an honest, intelligent human being, who was concerned with her physical condition. Although she certainly cannot be characterized as a disinterested witness, the Court finds that her testimony was nonetheless credible and that her answers were truthful. Moreover, no witness in this matter specifically testified of telling Plaintiff the exact nature and cause of her disease. In that regard, the Court finds that Mrs. Shostack did not know that the flu inoculation caused here illness before her consultation in Philadelphia.

We now turn to the question of whether Mrs. Shostack, in the exercise of reasonable diligence, should have learned of her illness' cause before March 10, 1981. The Court finds that had Mrs. Shostack made any inquiry with regard to this question, she would have discovered that the flu inoculation probably caused her to contract Guillain Barre Syndrome.

Our inquiry, however, does not end here. As the Court in *In re Swine Flu Products Liability Litigation, supra,* pointed out, "the 'should have reasonably known' standard looks not to the likelihood that a plaintiff would in fact have discovered the cause of his injury if [s]he had only inquired, but instead focuses on whether the Plaintiff could reasonably have been expected to make inquiry in the first place." *Id.* at p. 642, n. 2. To state the standard another way, the Court must determine whether the Plaintiff had sufficient critical facts which would impose upon the Plaintiff a duty of inquiry. Should the Court find that events surrounding an injury or illness should have caused the Plaintiff to become suspicious of a possible invasion of her legal rights, the Court can then find that Plaintiff should have exercised due diligence in attempting to determine the nature injury and its cause.

The application of the standard to the instant case, leads the Court to find that the Plaintiff should have made inquiries into the cause of her illness. A rehash of the facts establishes that there were a host of circumstances which would make the duty of inquiry reasonable and mandated in this case. For instance, it is established that Mrs. Shostack received two flu shots in November of 1977. Approximately five weeks later Mrs. Shostack became ill and was hospitalized for the first time in her life. Her hospitalization lasted for 58 days during which time she suffered from extreme symptoms, including paralysis and a collapsed lung which required a tracheostomy. Additionally, the Plaintiff underwent a battery of tests, including a spinal tap, in order to determine her injury. These facts, in and of themselves, would make it reasonable to expect the Plaintiff to make an inquiry. Additionally though, there exists other circumstances which should have made the Plaintiff inquire about her illness,

such as the fact that she had to undergo rehabilitation following her discharge from the hospital. Also, upon returning to work in July of 1977, the Plaintiff's weakened condition caused her to quit her job and even become curious as to why she was unable to perform tasks at her previous level. Plaintiff admits that she thought of asking her doctor about her illness. Finally, during the Plaintiff's pregnancy she was asked on at least two occasions about her illness, and we find that Nurse Davis, at the very least, mentioned the flu shot in connection with her earlier hospitalization.

In light of the above, this Court finds that the circumstances surrounding the Plaintiff's illness should have caused the Plaintiff to exercise due diligence in attempting to find the nature of her illness and its cause at the very latest in July, 1977—after she discovered her inability to fulfill the obligations of her employment with Sargent Art's. This factual finding establishes that the accrual date for Statute of Limitations' purposes arose in July, 1977. The Plaintiff's claim, therefore, filed on March 10, 1983, was untimely and is therefore barred by the Federal Tort Claims Act's two-year Statute of Limitations.

It is always difficult to deny a person's otherwise perfectly valid claim for injuries because it is untimely filed. But, as pointed out in *Kubrick*, the Statute of Limitations is vitally important if there is to be any sense of order in the civil justice system, and the responsibility to file a claim on time must reside with the claimant.

An Order entering judgment in favor of the Defendant follows.

### ORDER

NOW, THIS 2nd day of February, 1988, IT IS HEREBY ORDERED:

1. Judgment is hereby entered in favor of the Defendant.

2. The Clerk of Courts is directed to close this case.