EVA LYNN POPE AND WILLIAM WALTON MAGILL, APPELLANTS, *v.* BRUCE GRAY, M.D., AND WILLIAM H. THOMAS, M.D., RESPONDENTS.

No. 18117

August 25, 1988                                    760 P.2d 763

*Carl F. Martillaro* and *Paul Sherman,* Carson City, for Appellants.

*Joseph Van Walraven, Echeverria, Osborne & Jenkins,* and *Cathy L. Bradford,* Reno, for Respondents.

## OPINION

*Per Curiam:*

This is an appeal from a dismissal granted pursuant to NRCP 41(b) at the conclusion of plaintiffs' case in an action for wrongful death allegedly resulting from medical malpractice. The trial

judge held that the action was timebarred by the applicable statute of limitations, NRS 41A.097. We disagree, reverse and remand.

## The Facts

On May 8, 1982, Eva Magill, seventy-four, vomited a bloody fluid and was taken by her daughter, Eva Lynn Pope, to the Carson-Tahoe Hospital. The next day respondent Dr. Thomas performed tests on Magill to diagnose her problem. Later that day, he and co-respondent Dr. Gray performed surgery on Magill for a lower bowel obstruction. On May 10, a third physician, Dr. Baggett, performed a Swanz Ganz[1] on Magill, who died during or shortly after the procedure. One of the three doctors told Pope that her mother had died and they were not sure why.

On May 11, an autopsy was performed. The autopsy report was apparently filed with Magill's medical records on June 2, 1982. It indicated that the cause of death was coronary heart disease and acute gastrojejunitis. The death certificate, which previously stated that the cause of death would be filled in later, was modified on September 13, 1982 to reflect gastrojejunitis as the cause of death. Pope apparently received a copy of the death certificate around September 17, 1982. On September 11, 1984, Pope and her brother, William Walton Magill, filed a wrongful death action, alleging that respondents' medical malpractice cost them their mother's companionship.

At trial, after presentation of plaintiffs' evidence.[2] Gray and Thomas moved for dismissal under NRCP 41(b), arguing that the NRS 41A.097 two-year period of limitations had run before plaintiffs commenced their action. The physicians, citing Gilloon v. Humana, Inc., 100 Nev. 518, 687 P.2d 80 (1984), maintained that the statute began running on May 10, 1982, when Mrs. Magill died. The district court granted the motion, basing its decision in large measure on our holding in Gilloon.

## Discussion

The issue before us is whether Pope's[3] action was barred by the statute of limitations. NRS 41A.097 provides:

---

[1]This is apparently a procedure where a catheter is inserted into a pulmonary artery. T. Stedman, Stedman's Medical Dictionary 237 (1982).

[2]Pope argued at trial that Magill's death was caused by sepsis, and that respondents had misdiagnosed this problem. Gray and Thomas were prepared to argue that there was no misdiagnosis, and that Magill died of a heart attack, but the action was dismissed before they presented their evidence.

[3]Hereafter, appellants Pope and Magill will be collectively referred to as "Pope"; respondents Gray and Thomas will be referred to as "Gray."

1. Except as provided in subsection 2,[4] an action for injury or death against a provider of health care shall not be commenced more than . . . two years after the plaintiff discovers or through the use of reasonable diligence should have discovered the injury, for:

(a) Injury to or wrongful death of a person, based upon alleged professional negligence of the provider of health care.[5]

Gray argues that, in wrongful death actions, the two-year statute of limitations begins to run upon death; Pope contends that it commences running only when the decedent dies *and* the person bringing the wrongful death action suspects or reasonably should suspect that malpractice was the cause. The basic question is whether the discovery rule applied to medical malpractice personal injury actions in Massey v. Litton, 99 Nev. 723, 669 P.2d 248 (1983), also applies to medical malpractice wrongful death actions by heirs. We conclude, in accordance with our decision in *Massey,* that it does.

In *Massey,* the injured plaintiff lost the use of her foot after an operation. Several years later, she sued Litton for malpractice. Litton argued that NRS 41A.097 barred the action because it was filed more than two years after Massey discovered the physical harm, loss of foot control. However, Massey countered that she did not discover proof of Litton's negligence until well after she discovered the physical harm, and that the statute's two-year provision should not actuate until the victim discovers both the injury and the facts suggesting negligence.

In deciding *Massey,* we considered whether the two-year statute, which begins running upon discovery of the "injury," should be interpreted as commencing (1) when the physician performed the allegedly negligent operation; (2) when the patient discovered, or should have discovered, the physical harm; or (3) when the patient discovered, or should have discovered, that he or she suffered physical harm and that it resulted from the health care provider's negligence. In choosing the third option, we reasoned that the term "injury," as used by NRS 41A.097, meant "legal injury," which "encompasses not only the physical damage but also the negligence causing the damage." *Massey,* 99 Nev. at

---

[4]Subsection 2 provides: "This time limitation is tolled for any period during which the provider of health care has concealed any act, error or omission upon which such action is based and which is known or through the use of reasonable diligence should have been known to him." No evidence of concealment was presented in this case.

[5]In 1985, after Pope brought her action, NRS 41A.097 was modified. However, the changes do not affect the statutory language involved in this appeal.

726, 669 P.2d at 250. We concluded that an interpretation providing that the statutory period commenced to run only when a plaintiff discovers or should have discovered "legal injury" would be the most equitable construction of NRS 41A.097. Our ruling was in accord with the rule in many other jurisdictions. *See* Restatement (Second) of Torts § 899 comment e (1979).

We see no reason why the rule in *Massey* should not also apply, under the statute, to wrongful death actions for medical malpractice. Accordingly, we conclude that the two-year statutory period for wrongful death medical malpractice actions does not begin to run until the plaintiff discovers or reasonably should have discovered the legal injury, i.e., both the fact of death and the negligent cause thereof.

Respondent argues, however, that in *Gilloon*, 100 Nev. 518, 687 P.2d 80, we considered and rejected the idea that the discovery rule applies to wrongful death actions. In *Gilloon*, decedent's daughter filed a wrongful death action in 1981, both as an heir and as a personal representative, alleging that a physician's malpractice in 1976 caused her mother's death in 1979. The district court dismissed the action on summary judgment, reasoning that under NRS 41A.097, the injury occurred in 1976, when the doctor allegedly committed malpractice on the mother, and therefore the two-year limitation barred the daughter's action. We reversed, holding "in an action for wrongful death, the injury contemplated by NRS 41A.097 is the death of the malpractice victim and the two-year period of limitation begins to run from the time of death or the discovery thereof." 100 Nev. at 519-20, 689 P.2d at 81. Gray argues that this statement was a ruling that in wrongful death actions, the statutory period always actuates at the time of death.

However, an examination of *Gilloon* in its entirety reveals the flaw in Gray's characterization of our holding. In *Gilloon*, the decedent allegedly received negligent treatment in 1976 that led to her death in 1979. The hospital argued that, for purposes of NRS 41A.097, the injury triggering the statute was the alleged negligent treatment that occurred in 1976. The hospital maintained that because Gilloon did not bring her action until after her mother died in 1979, the action was barred by the two-year statute of limitations. We disagreed with this reasoning, noting that the hospital's construction could bar potential plaintiffs from court "before they had ever had a chance to bring suit." *Gilloon*, 100 Nev. at 521, 687 P.2d at 82. Moreover, in *Gilloon*, we cited with approval the definition of injury adopted in *Massey* and suggested that we intended it to apply in wrongful death cases:

> Our construction is also consistent with our reasoning in *Massey v. Litton*, 99 Nev. 723, 669 P.2d 248 (1983), in

which we held that in an action for malpractice the term "injury" in NRS 41A.097 means legal injury, *i.e.*, the essential elements of a cause of action, and does not refer merely to the physical harm. The death of the decedent being an essential element of the cause of action for wrongful death, there can be no legal injury until the death has occurred.

*Id.* Notwithstanding this language in *Gilloon,* Gray argues that our holding adopted a construction of NRS 41A.097 in which knowledge of mere physical harm, death, triggers the statute of limitations. However, such a construction would be inconsistent with the rationale of both *Gilloon* and *Massey,* in which we held that legal injury, and not mere physical injury, triggers the 41A.097 statute of limitations.[6]

Although logical consistency with our earlier decisions is important, there are other cogent reasons for applying the discovery rule to wrongful death actions. For example, if we held that death automatically triggers the period of limitations, such a holding could destroy a right of action even before an aggrieved person learns of the existence of the right. A corollary problem would also be created: to avoid a loss of a potentially meritorious claim, plaintiffs' attorneys may precipitously file premature actions, or even actions that later turn out to be frivolous, in order to avoid the risk of having a meritorious action barred by NRS 41A.097. However, as we noted in *Massey:*

[W]hen injuries are suffered that have been caused by an unknown act of negligence by an expert, the law ought not to be construed to destroy a right of action before a person even becomes aware of the existence of that right.

Furthermore, to adopt a construction that encourages a person who experiences an injury, dysfunction or ailment, and has no knowledge of its cause, to file a lawsuit against a health care provider to prevent a statute of limitations from running is not consistent with the unarguably sound proposition that unfounded claims should be strongly discouraged.

---

[6]In essence, what we were saying in *Gilloon* was that the very earliest that the statute of limitations could begin to run for a wrongful death action would be at death, and not before. This is evidenced by our statement "The death of the decedent being an essential element of the cause of action for wrongful death, there can be no legal injury *until* the death has occurred." *Gilloon,* 100 Nev. at 521, 687 P.2d at 82 (emphasis added). In *Gilloon,* because the plaintiff discovered the negligence before death occurred, death was the final element necessary to trigger the two-year statute of limitations. However, in the immediate case, the discovery of alleged negligence may not have occurred until after death, and accordingly, death was not necessarily the event which triggered the two-year statute of limitations, as it was in *Gilloon.*

99 Nev. at 727, 669 P.2d at 251 (quoting Foil v. Ballinger, 601 P.2d 144, 147-48 (Utah 1979)).

Moreover, applying the discovery rule to personal injury actions, but not wrongful death actions, is incongruous and difficult to justify. In Fure v. Sherman Hospital, 380 N.E.2d 1376 (Ill.App.Ct. 1978), after considering defendant's argument that the discovery rule should be limited to medical malpractice personal injury actions, the court stated "it [is] rather difficult to maintain [a] severe legal distinction which allows the law to give more protection to the wounding of a man than to the ultimate disaster of his death." *Id.* at 1384. In Hanebuth v. Bell Helicopter Int'l, 694 P.2d 143 (Alaska 1984), the Alaska Supreme Court agreed with this reasoning: "if the discovery rule is not applied to wrongful death actions, a tortfeasor whose conduct has been so grievous as to cause death [might] be exonerated, while another tortfeasor, guilty of the same conduct except for the fortuity that it merely caused injury, would be held responsible." *Id.* at 147.

Other courts have concluded that the discovery rule applies to wrongful death actions, including those for medical malpractice. *E.g. Hanebuth,* 694 P.2d 143; *Fure,* 380 N.E.2d 1376; Shaughnessy v. Spray, 637 P.2d 182 (Ore.Ct.App. 1981); *cf. In re* Swine Flu Prods. Liab. Litig., 764 F.2d 637 (9th Cir. 1985) (in Ninth Circuit, discovery rule applies to medical malpractice wrongful death action under Federal Tort Claims Act[7]); Myers v. McDonald, 635 P.2d 84 (Utah 1981) (statute tolled until plaintiff learned or reasonably should have learned of decedent's death); White v. Johns-Manville Corp., 693 P.2d 687 (Wash. 1985) (discovery rule applied to action for wrongful death caused by latent disease).[8]

---

[7]The court noted that the federal circuits were split on the issue of whether the discovery rule applied to medical malpractice wrongful death actions. 764 F.2d at 639.

[8]We are aware, as respondents argue, that other courts have refused to extend the discovery rule to wrongful death actions. *E.g.* Gonzales v. Denver & Rio Grande W. R.R. Co., 686 P.2d 1362 (Colo.Ct.App. 1984); Greenock v. Rush Presbyterian St. Luke's Medical Center, 382 N.E.2d 321 (Ill.App.Ct. 1978); Clark v. Prakalapakorn, 648 P.2d 278 (KansasCt.App. 1982); Trimper v. Porter-Hayden, 501 A.2d 446 (Md. 1982); Presslaff v. Robins, 403 A.2d 939 (N.J.Super.Ct.App.Div. 1979); Morano v. St. Francis Hospital, 420 N.Y.S.2d 92 (App.Div. 1979); Hubbard v. Libi, 229 N.W.2d 82 (N.D. 1975); Pastierik v. Duquesne Light Co., 526 A.2d 323 (Pa. 1987). However, these courts were often interpreting statutes, unlike ours, which expressly state that the cause of action commences upon death. *E.g. Greenock,* 382 N.E.2d at 323; *Trimpler,* 501 A.2d at 448; *Presslaff,* 403 A.2d at 940; *Morano,* 420 N.Y.S.2d at 94; *Hubbard,* 229 N.W.2d at 84. Accordingly, courts in these jurisdictions have concluded that their "statute leaves no room for judicial adoption of some form of discovery rule." *Trimper,* 501 A.2d at 449. Our legislature has not so worded NRS 41A.097,

Finally, we do not believe that the policy considerations behind the statute of limitations would be thwarted by applying the discovery rule to medical malpractice wrongful death actions. The United States Supreme Court has noted that statutes of limitations "are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." Order of R.R. Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348-49 (1944). However, the discovery rule does not operate to save those who have slept on their rights. And, in the instant case, respondents have not demonstrated that they suffered prejudice because appellants brought their action two years and four months following death.

Gray argues that even if the discovery rule applies to wrongful death actions, Pope's action is barred because she should have discovered facts suggesting the alleged malpractice at least two years before she filed the action. More specifically, Gray argues Pope should have been alerted to possible malpractice when the doctors informed her that they were not certain of the cause of death, or, at the very latest, on June 2, 1982, when the autopsy report listing acute gastrojejunitis as the cause of death was filed. The district court agreed, ruling that her September 11, 1984 filing was not timely.[9] In doing so, the court erred.

---

and therefore, we believe that the application of the discovery rule to wrongful death cases produces the most equitable result.

Gray cites Larcher v. Wanless, 557 P.2d 507 (Cal. 1976), to support his contention that the "majority view in this country" is that the discovery rule does not apply to wrongful death malpractice actions. We do not agree that Larcher supports this assertion. The court in Larcher concluded, as we conclude, that in a wrongful death action, "injury," as used in California's wrongful death statute of limitations, refers to "the death, with its allegedly wrongful cause, which gives rise to the lawsuit." 557 P.2d at 509. The court in Larcher went on to conclude that the plaintiff, in that situation, did have only one year from death to bring her wrongful death action. However, in Larcher, the plaintiff was aware, before death, of the possible negligence that caused decedent's death. 557 P.2d at 509. Accordingly, as in Gilloon, 100 Nev. 518, 687 P.2d 80, the cause of action accrued at the happening of the last event necessary to complete the cause of action, or at death.

We do not agree, as Gray contends, that Larcher stands for the proposition that in California, which has a statute similar to ours, the statute of limitations for malpractice wrongful death actions begins to run at death. In fact, given Larcher's definition of injury and reasoning, it appears that California also applies the discovery rule to wrongful death malpractice actions.

[9]The district court stated:

[O]ne of the key pieces of testimony that I apply in my ruling is the testimony of Mrs. Pope, that the doctors came out and said, we don't know why she died, to me that is the red flag that went up if, in fact there was a cause of action, that it probably occurred right at that time. Certainly not later than June 1982.

Before granting an NRCP 41(b) motion, a district court should view the evidence in a light most favorable to the opposing party. Adelman v. Arthur, 83 Nev. 436, 433 P.2d 841 (1967). The evidence, when so viewed, does not necessarily suggest that Pope should have suspected malpractice before September 11, 1982. Pope's mother died suddenly, after no apparent long-standing illness. Even though the doctors told Pope, on the day of her mother's death, that they did not know why she died, given Magill's age, surgical treatment, and serious manifestation of poor health two days before her death, death alone would not necessarily suggest, to a reasonably prudent person, that the decedent succumbed to the effects of medical malpractice.

Although the autopsy report specifying acute gastrojejunitis as the cause of death was apparently placed with Magill's medical records on June 2, 1986,[10] available for Pope's examination, Pope advanced at least a reasonable argument that she should not have been expected to suspect malpractice until September 17, 1982, when she received her mother's death certificate. Given the standard of review for 41(b) motions, requiring the facts to be viewed in a light most favorable to the non-moving party, we conclude it was error to decide this factual issue on motion.

Accordingly, having considered the arguments of the parties, we hereby reverse and remand for a new trial.

---

[10]Gray argues that Pope admitted receiving the autopsy report on June 2, 1982. At trial, the judge posed the following question: "One of the things that concerns me is when the autopsy report was completed. Counsel have any stipulation as to the particular fact?" Counsel for both parties discussed the question, and finally, Gray's counsel made the following statement: "Apparently the autopsy was conducted on May 11, 1982. The final report down here is June 2, 1982." Pope's counsel indicated that he did not disagree with those dates.

Gray has, on appeal, apparently interpreted his undisputed statement to the judge "The final report down here is June 2, 1982" as an admission by Pope that she actually received the records on June 2, 1982. However, after examination of the record, we do not believe that this statement necessarily constituted such an admission. Although the exact meaning of counsel's statement "The final report down here is June 2, 1982" is not totally clear, it could have, and quite possibly did mean, that the report was placed with Magill's hospital records on June 2; the statement does not imply that the autopsy report was, at that time, sent to Pope. Obviously, the fact that the report was placed with the records June 2 does not necessarily mean Pope "received" them on that day, or reasonably should have examined them on that day.