**Victoria ROSÁLES; Jesus Rosales; Rebecca Rosales, Plaintiffs-Appellants,**

v.

**UNITED STATES of America; Defendant-Appellee.**

No. 86–5894.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 5, 1987.

Decided Aug. 12, 1987.

Ian Herzog, Los Angeles, Cal., for plaintiffs-appellants.

Shari K. Silver, Los Angeles, Cal., for defendant-appellee.

Before PREGERSON, NELSON and WIGGINS, Circuit Judges.

NELSON, Circuit Judge:

Plaintiffs appeal from a judgment dismissing their claims under the Federal Tort Claims Act, 28 U.S.C. § 2674 (1982) ("FTCA"). They argue that the district court erred in holding that the two-year statute of limitations in 28 U.S.C. § 2401(b) (1982) bars their claims. We have jurisdiction under 28 U.S.C. § 1291 (1982). We reverse and remand.

## I. BACKGROUND

In the summer of 1981, Rebecca Rosales became pregnant and sought medical care at a Marine Corps installation in El Toro, California, where her husband was stationed. In late August 1981, a physician at Camp Pendleton Regional Medical Center examined Mrs. Rosales. She told him that she had been using an intrauterine contraceptive device ("IUD"), but the examination did not reveal the IUD. The physician told Mrs. Rosales that the IUD might have fallen out and referred her to an outside clinic for ultrasound tests. Medical personnel told her that many women deliver normal babies with an IUD in place. The physician did not inform her of the risks of continuing her pregnancy with an IUD in place or discuss possible alternatives to continuing the pregnancy, then in the first trimester.

In late October 1981, the hospital performed an ultrasound procedure, which revealed that the IUD was in place. No one at the hospital informed Mrs. Rosales of the possible danger to the fetus or discussed alternatives to continuing the pregnancy.

In December 1981, Mrs. Rosales was referred, through a federal program for dependents of armed forces personnel, to a civilian physician, Dr. Williams, at Mission Community Hospital. The Rosaleses contend that on December 9 Dr. Williams told Mrs. Rosales that pregnancy with an IUD posed some risks, did not inform her of specific risks, and told her of the dangers of aborting at this stage of her pregnancy. The government offered evidence suggesting a different version of the facts: Dr. Williams' discharge report, prepared after the child's birth the following March, stated that Mrs. Rosales "was made aware of the potential problems, with respect to an IUD in pregnancy, but elected to carry on with the pregnancy, understanding full well, the potential risks of IUD and intra-

uterine pregnancy." Discharge Summary, Exhibit 102, at 1.[1]

On March 7, 1982, Mrs. Rosales entered Mission Community Hospital and delivered by cesarean section a child who was approximately three weeks premature. The physician who delivered Victoria[2] told Mrs. Rosales that the baby had a "lazy lid" associated with premature birth, which she would outgrow within a year. The delivering doctor and hospital pediatrician told Mrs. Rosales that Victoria was healthy and did not mention any problems. When the pediatrician checked Victoria at six weeks, he noted that she was small, but again said that she seemed fine.

In July 1982, Mrs. Rosales took Victoria to the El Toro clinic for a regular four-month checkup. The examining doctor noted that Victoria was premature and had a lag on her eyelid. The physician said, however, that Victoria was an "active, happy baby." In August, Mrs. Rosales told Dr. Lytle, a pediatrician at the El Toro clinic, that she was concerned about Victoria's size and mild lethargy. Dr. Lytle referred her to the Children's Hospital of Orange County. On August 6, 1982, Dr. Fowler of the Children's Hospital recommended and performed a CAT scan and told Mrs. Rosales that he would inform her of the result.

On September 9, Dr. Fowler sent a letter to Dr. Lytle indicating his "diagnostic impression" that Victoria had nonprogressive encephalopathy and stating that one possible origin of retardation "would be an intrauterine infection." Sometime in September 1982, Dr. Fowler informed the plaintiffs that Victoria "might" be retarded. He apparently did not discuss a possible cause of retardation with Mrs. Rosales, and he did not mention any possible link between the IUD and Victoria's problem. Dr. Fowler suggested an opthalmologic evaluation and a repeat CAT scan six

1. Dr. Williams' contemporaneous notes respecting his consultation with Mrs. Rosales on December 9 state only that "P[atien]t. realizes the risk of pregnancy with IUD in." Patient's Record, Exhibit 101.

2. Mrs. Rosales states that the delivering physician was "Dr. Williams' partner." Declaration of Rebecca Rosales at 9. The government's appellate brief states that it was Dr. Williams himself. Government Brief at 4. As noted above, Dr. Williams prepared the delivery discharge report.

months later. In December 1982, Dr. Brown, an opthalmolgist at the Naval Regional Medical Center in Long Beach, also recommended a repeat CAT scan if Victoria's sluggish eye reaction persisted, in order "to R[ule]/o[ut] associated brain abnormalities." Consultation Sheet, Exhibit E. In March 1983, the second CAT scan confirmed that Victoria showed permanent mental retardation. However, Dr. Fowler did not mention to the plaintiffs that the IUD was a possible cause of the child's retardation.

In April 1984, the plaintiffs consulted an attorney who suggested that they show Victoria's medical records to another physician. In June 1984, Dr. Chusid told the plaintiffs that the retardation appeared to have been caused by a bacterial infection, which in turn could have been caused by the IUD puncturing the amniotic sac. On July 9, 1984, the Rosaleses filed administrative claims with the government on behalf of Victoria for personal injuries including "brain damage, vision problems, loss of hearing and further physical defects." On approximately September 27, 1984, Mrs. Rosales filed claims for unspecified injuries caused by the alleged malpractice, and Mr. Rosales filed claims for "[m]ental and emotional distress in witnessing the malpractice and the sequela thereof occasioned to both his wife and minor child." [3]

The government did not respond to the claims. In September 1985, the plaintiffs filed suit in district court under the FTCA. *See* 28 U.S.C. § 2675(a) (1982). The first count for medical malpractice asserted mental, emotional, and physical injuries to Mrs. Rosales and Victoria caused by the Camp Pendleton doctors' failures to locate the IUD and to warn of the danger of continuing a pregnancy with an IUD in place. The second count set forth Mr. Rosales's claims for negligent infliction of emotional distress based on his witnessing the injury to the mother and child. The government moved to dismiss for lack of subject matter jurisdiction under Fed.R.

Civ.P. 12(b)(1) and for failure to state a claim under Fed.R.Civ.P. 12(b)(6). The district court held that 28 U.S.C. § 2401(b) bars the claims because the plaintiffs did not file their administrative claims within two years of the accrual of their actions. It dismissed the action for failure to state a claim.

## II. DISCUSSION

■ Section 2401(b) of the FTCA requires that a plaintiff file an administrative claim with the appropriate federal agency "within two years after such claim accrues." 28 U.S.C. § 2401(b) (1982). A medical malpractice claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, both the injury and its cause. *In re Swine Flu Prods. Liab. Litig.*, 764 F.2d 637, 639–40 (9th Cir.1985); *Dyniewicz v. United States*, 742 F.2d 484, 486 (9th Cir. 1984); *Augustine v. United States*, 704 F.2d 1074, 1078 (9th Cir.1983); *see United States v. Kubrick*, 444 U.S. 111, 122–23, 100 S.Ct. 352, 359–60, 62 L.Ed.2d 259 (1979).

■ At the outset, we note several procedural irregularities in the disposition of the case below. First, although the district court dismissed the Rosaleses' complaint for failure to state a claim, its order clearly went beyond the pleadings and considered facts set forth in affidavits and exhibits submitted by the parties. If matters external to the pleadings are presented to the court and not excluded, a Rule 12(b)(6) motion for failure to state a claim should be treated as a motion for summary judgment. *See Ellis v. Cassidy*, 625 F.2d 227, 229 (9th Cir.1980); Fed.R.Civ.P. 12.

■ Second, our cases have stated that timely compliance with the statute of limitations in 28 U.S.C. § 2401(b) is jurisdictional. *Gibson v. United States*, 781 F.2d 1334, 1343 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 928, 93 L.Ed.2d 979

---

3. Although Victoria's claims were dated June 26, 1984, and her parents' claims were dated August 10, 1984, claims are deemed to be filed when received by the appropriate federal agency. *See*

28 C.F.R. § 14.2(a) (1986). The parents' claims apparently lack notation of the date of receipt; for purposes of this appeal, the government stipulates that they were filed on September 27.

(1987); *Swine Flu*, 764 F.2d at 638; *Dyniewicz*, 742 F.2d at 485. A district court may hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question prior to trial, if the jurisdictional facts are not intertwined with the merits. *Augustine*, 704 F.2d at 1077; *see Roberts v. Corrothers*, 812 F.2d 1173, 1176–78 (9th Cir.1987); *Timberlane Lumber Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 749 F.2d 1378, 1381–82 (9th Cir. 1984), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985); *Data Disc, Inc. v. Systems Technology Assocs.*, 557 F.2d 1280, 1285 & n. 2 (9th Cir.1977). In such circumstances, no presumption of truthfulness attaches to the plaintiff's allegations. *Augustine*, 704 F.2d at 1077. However, if the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment and grant the motion to dismiss for lack of jurisdiction only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *See id.* Otherwise, the intertwined jurisdictional facts must be resolved at trial by the trier of fact. *Id. See generally Crawford v. United States*, 796 F.2d 924, 926–29 (7th Cir.1986).

In this case, the court apparently did not consider whether the jurisdictional facts were intertwined with, or distinct from, the substantive issues. We assume, without deciding, that the issues are not intertwined because the doctor who allegedly informed Mrs. Rosales of the risks (Dr. Williams at Mission Community Hospital) is not the doctor or doctors who allegedly subjected her to malpractice (at Camp Pendleton Regional Medical Center). Thus, for purposes of this appeal, we attach no presumption of truthfulness to the Rosaleses' allegations. However, in view of certain undisputed facts in the record and even accepting the government's contention that Dr. Williams informed Mrs. Rosales of specific risks, we conclude that the Rosaleses' claims are not timebarred.[4]

### A. Victoria Rosales's Claims

■ The key date for Victoria's claims is July 9, 1982, two years prior to the filing of her administrative claims on July 9, 1984.[5] In order for the government to prevail on Victoria's claims, they must have accrued prior to that date. The government argues that because Dr. Williams told Mrs. Rosales in December 1981 that an IUD could cause some unspecified complications and because Victoria was born prematurely with a lazy lid, Victoria's claims accrued at her birth on March 7, 1982. The district court accepted this approach on the basis of *Brown v. United States*, 353 F.2d 578 (9th Cir.1965), and *Arvayo v. United States*, 766 F.2d 1416 (10th Cir.1985). It reasoned that at Victoria's birth her parents "had access to all the pertinent and critical facts surrounding their daughter's birth." It made "no difference," the court stated, whether Dr. Williams' warning was vague or specific; "[i]t was sufficient enough to put the claimants on notice that something was amiss." The court concluded that, if the Rosaleses had investigated the situation promptly, they would have discovered the cause of Victoria's injury within two years of her birth.

**4.** Of course, should *other* facts later emerge that demonstrate that the action is time-barred, the district court should dismiss the action. *See* Fed.R.Civ.P. 12(h)(3) (lack of subject matter jurisdiction may be raised at any time). We conclude only that, based on the record before us and even assuming the government's version of the extent to which Dr. Williams informed Mrs. Rosales of the risks, the action is not time-barred.

The limitations and substantive issues would be intertwined if, as the government suggests, Mrs. Rosales was informed of the risks before December 9, 1981, by the Camp Pendleton staff. *See* Memorandum of Points and Authorities in Support of Motion to Dismiss at 11 n. 2. Applying summary judgment procedures to such a situation, and viewing the evidence in the light most favorable to the Rosaleses, *see Raddatz v. United States*, 750 F.2d 791, 795 (9th Cir.1984), we would similarly conclude that the dismissal of the claims was inappropriate.

**5.** The papers filed on September 27 also included claims for the child, which merely duplicated those filed on July 9.

This approach misconstrues the "should have reasonably known" standard. As we have recently held, the standard "looks not to the likelihood that a plaintiff would in fact have discovered the cause of his injury if he had only inquired, but instead focuses on whether the plaintiff could reasonably have been expected to make the inquiry in the first place." *Swine Flu*, 764 F.2d at 642 n. 2. In this case, not only did the Rosaleses have no reason at Victoria's birth to inquire about any cause of injury; they also had no reason to believe there was an injury to Victoria at all.

■ A medical malpractice claim under the FTCA accrues only when the injury has manifested itself. *Davis v. United States*, 642 F.2d 328, 330–31 (9th Cir.1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1273, 71 L.Ed.2d 459 (1982); *see also Kubrick*, 444 U.S. at 120 n. 7, 122, 100 S.Ct. at 358 n. 7, 359. Patients may reasonably rely on assurances by physicians that complications are normal and do not indicate that an actual injury has occurred. *Raddatz*, 750 F.2d at 796; *see Simmons v. United States*, 805 F.2d 1363, 1368 (9th Cir.1986). In *Raddatz*, the plaintiff sued under the FTCA when her Navy physician failed to diagnose and inform her of a uterine infection resulting from an Army doctor's perforation of her uterus. The Army doctor had inserted an IUD into the plaintiff's uterus, but removed it immediately and informed the plaintiff that he had injured her. The Navy doctor told the plaintiff that her cramps, discomfort, and severe pain were normal side effects of perforation of the uterus. In fact, the plaintiff was suffering from pelvic inflammatory disease, an infection resulting from the perforation. The Navy doctor failed to diagnose the infection and did not administer antibiotics. The plaintiff finally consulted a civilian doctor who diagnosed the disease and ultimately performed a hysterectomy. *Raddatz*, 750 F.2d at 793–94. We held that the plaintiff's cause of action accrued not when the Navy doctor failed to diagnose her condition properly, but when "her private physician made her aware that her perforated uterus had developed an infection." *Id.* at 796.

■ This case presents a similar situation. For several months after Victoria was born, doctors repeatedly assured the Rosaleses that the child's lazy lid was temporary and that no injury was present. Even assuming that Dr. Williams told Mrs. Rosales of specific risks in December 1981, after Victoria's birth the Rosaleses, like the plaintiff in *Raddatz*, relied on the assurances of the doctors that no harm had in fact occurred. Hence the Rosaleses did not know of Victoria's injury at the time of her birth in March 1981, and reasonably should not have discovered it in light of assurances from a number of physicians. *See Augustine*, 704 F.2d at 1078 (stating that in a failure to warn case "it is only when the patient becomes aware or through the exercise of reasonable diligence should have become aware of the development of a preexisting problem into a more serious condition that his cause of action can be said to have accrued for purposes of section 2401(b)"); *accord Raddatz*, 750 F.2d at 796.

*Brown v. United States*, 353 F.2d 578 (9th Cir.1965), on which the district court relied, is clearly distinguishable. In *Brown*, we upheld a lower court finding after trial that the limitations period had run when the action was filed approximately seven years after physicians told the plaintiffs that their child was blind and that the blindness was caused by the administration of oxygen at the child's birth. *Id.* at 580 ("It is clear ... that the parents, not later than [the year following the child's birth and seven years prior to the filing of the suit], were informed as to the exact nature of the disability and its relationship to prior medical treatment."). In the instant case, the Rosaleses first learned that Victoria might be retarded in September 1982. In March 1983, Dr. Fowler and the second CAT scan confirmed that Victoria was permanently retarded. In either event, the cause of action for Victoria's injuries did not accrue until well after July 9, 1982.

We further note that the undisputed materials in the record show that the Rosales-

es did not know, and reasonably should not have known, of the *cause* of Victoria's injury until well after July 9, 1982. The government does not dispute the plaintiffs' assertion that Dr. Fowler did not mention to them in or before September 1982 that the IUD might have caused the suspected retardation. Indeed, in September 1982 Dr. Fowler himself had not been able to diagnose the cause of the retardation. His letter of September 9 to Dr. Lytle, the physician at the El Toro clinic, stated: "The etiology of the encephalopathy is uncertain. One consideration would be an intrauterine infection." Ordinarily, a plaintiff cannot be expected to discover the general medical cause of his injury even before the doctors themselves are able to do so. *See Jastremski v. United States*, 737 F.2d 666, 669–70 (7th Cir.1984) (upholding finding that the limitations period did not begin to run until the plaintiff, a doctor whose son had seizures at birth and had an abnormal gait at age two that was first diagnosed as an orthopedic problem, consulted a neurological specialist who diagnosed the injury as neurological in origin—cerebral palsy).

In this respect, *Arvayo v. United States*, 766 F.2d 1416 (10th Cir.1985), upon which the district court also relied, is distinguishable. In *Arvayo*, a divided panel of the Tenth Circuit held that the limitations period began to run at a time when, after the plaintiffs knew of their child's injury (brain damage) and its immediate medical cause (bacterial meningitis), they reasonably should have inquired and discovered whether the doctors negligently failed to diagnose and treat the meningitis at an earlier time. *Arvayo*, 766 F.2d at 1418–22; *see also Fernandez v. United States*, 673 F.2d 269, 271–72 (9th Cir.1982) (holding that knowledge of the child's injury caused by jaundice requires the plaintiff to inquire and discover whether the doctor's diagnosis and treatment of jaundice were too late); *cf. Gibson*, 781 F.2d at 1344 (knowledge of cause is knowledge of immediate physical cause, not knowledge of culpability of federal agents); *Dyniewicz*, 742 F.2d at 486–87 (same). In the instant case, not even the doctors knew of the probable general

medical cause—a bacterial infection brought on by a punctured uterus, as opposed to a genetic defect—until well after July 1982. *See Jastremski*, 737 F.2d at 670.

The government contends that setting the date of accrual at any time later than the date of Victoria's birth would impermissibly delay accrual until such time as the plaintiffs had knowledge of the defendant's alleged legal fault. It is well settled that the limitations period begins to run when the plaintiff has knowledge of injury and its cause, and not when the plaintiff has knowledge of legal fault. *See Kubrick*, 444 U.S. at 121–23, 100 S.Ct. at 359–60; *Simmons*, 805 F.2d at 1366–67; *Gibson*, 781 F.2d at 1344; *Fernandez*, 673 F.2d at 272; *Davis*, 642 F.2d at 330–31. Paragraph 7 of the plaintiffs' complaint appears to advance an argument directed to a "knowledge of legal fault" approach. However, the plaintiffs did not advance such a theory in their opposition memoranda in the court below and disavow any such theory on appeal. Below and on appeal, the plaintiffs argue that their claims did not accrue until they discovered, or reasonably should have discovered, the fact of Victoria's injury and the likely cause of that injury. We conclude that the district court erred in dismissing the claims for Victoria's injuries.

### B. The Parents' Claims

█ The Rosaleses filed administrative claims for their own injuries and emotional distress on September 27, 1984. The district court held that these claims were barred because the administrative claims forms listed the date of the accident as August 31, 1981. The Rosaleses assert, evidently for the first time on appeal, that their claims should be deemed an amendment that relates back to those filed on behalf of Victoria in July 1984. *See Avila v. INS*, 731 F.2d 616, 619–20 (9th Cir.1984); 28 C.F.R. § 14.2(a) (1986); *cf.* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1501 (1971 & Supp.1986) (noting liberal application of relation-back provision in Fed.R.Civ.P. 15(c), especially when addi-

tional plaintiffs in connection with same incident and previously named defendant are added to the complaint, and there is no prejudice to the defendant). They further contend that in any event they did not know of Victoria's injury until after September 1982.

Contrary to the district court's assumption, the crux of the parents' claims appears to be the emotional distress allegedly caused by the knowledge of Victoria's retardation.[6] Dr. Fowler told Mrs. Rosales sometime in September 1982 only that the first CAT scan revealed that Victoria *might* be retarded. After the plaintiffs' additional, inconclusive consultations with a second doctor (Dr. Brown) in December 1982, Dr. Fowler's preliminary diagnosis was confirmed in the second CAT scan in March 1983. Thus, the record shows that the Rosaleses did not discover the child's retardation before September 27, 1982, and reasonably could not have discovered it before the doctors themselves diagnosed the child's injury in March 1983. Accordingly, the district court erred in dismissing the parents' claims. In light of this holding, we do not address the plaintiffs' relation-back theory, which was not advanced before the court below and which the government does not address on appeal.

## CONCLUSION

For the reasons given above, the district court erred in dismissing the plaintiffs' claims on the basis of the two-year statute of limitations in 28 U.S.C. § 2401(b) (1982). Accordingly, we reverse and remand to the district court for proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

6. The record is unclear as to whether Mrs. Rosales maintains a claim for any physical injury to herself as a result of the alleged malpractice, as her administrative claim seems to suggest. In addition, we express no view on whether the Rosaleses may have stated a claim for emotional distress caused by their knowledge of the *risk* of injury to the child before the injury was manifested in March 1983. The record does not show whether such claims are truly at issue in this case; the parties addressed them only to the slightest extent below. We do not preclude the district court from entertaining argument on these vaguely phrased claims or from deciding the extent to which, if any, the statute of limitations may apply to them.