**Clarence L. BOLEN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 86–4039.

United States District Court, D. Idaho.

Dec. 15, 1989.

James J. Ryan, St. Paul, Minn., Steven Wood, Pocatello, Idaho, for plaintiff.

Maurice O. Ellsworth, U.S. Atty., D. Marc Haws, Asst. U.S. Atty., Boise, Idaho, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CALLISTER, Senior District Judge.

A court trial was held in the above-entitled matter on November 6, 7, and 8, 1989. At the conclusion of the testimony, the Court ordered further briefing which has been received. The case is now at issue and ready to be resolved. This written decision shall constitute the Court's findings of fact and conclusions of law rendered pursuant to Fed.R.Civ.P. 52(a).

The plaintiff Clarence Bolen brought this suit against the United States on April 2, 1986. He claims to suffer from an affliction known as Tardive Dyskinesia caused by his use of a Phenothiazine drug called Stelazine for over ten years without proper monitoring by the Veterans Administration (V.A.) doctors who prescribed the drug for him. Two issues must be resolved in this lawsuit:

(1) Was the suit filed within the statute of limitations?

(2) If the suit was timely filed, did plaintiff carry his burden of proving that the Government physicians were negligent in failing to properly monitor him while he was taking Stelazine?

With this background in mind, the Court will proceed to make its factual findings.

## FINDINGS OF FACT

The advent of Phenothiazine drugs ushered in "[a] signal advance in the care of the mentally ill." SCHMIDT AND JARCHO, *Persistent Dyskinesias Following Phenothiazine Therapy*, 14 Archives of Neurology, April 1966 at p. 369 (Plaintiff's Exhibit 11). Unlike traditional sedatives, these drugs could calm an agitated patient without inducing sleep or impairing motor control. *Drug Treatment in Psychiatry* (Veterans Administration, January 1970) at p. 2 (Plaintiff's Exhibit 16). The number of psychiatric patients needing hospitalization plummeted dramatically with the introduction of these drugs. *See* unnumbered chart attached to back of Plaintiff's Exhibit 16. Dr. Jess Groesbeck, a board certified psychiatrist, testified that Phenothiazines were a revolutionary drug that emptied mental institutions, allowing treatment on an outpatient basis.

The Phenothiazine drug involved in this case is Trifluoperazine known by its United States trade name, Stelazine. The testimony of experts was united that Stelazine was a potent Phenothiazine with side-effects. A national publication known as "The Physicians Desk Reference" (PDR) details these side-effects. Defendant's Exhibit 107. Published annually, the PDR contains information provided by the drug manufacturers concerning the properties of drugs approved by the Food and Drug Administration (FDA).

The 1963 PDR noted that Stelazine was "outstanding" for treating anxiety. Plaintiff's Exhibit 7. In its listing of side-effects, the 1963 PDR notes that Stelazine may cause "pseudo-Parkinsonism" with symptoms including tremors, drooling, and shuffling gait. This PDR also warned of "dystonias" such as neck spasms, protrusion of the tongue and back muscle rigidity, but also noted that these problems occur "suddenly" and are "promptly reversible and need not cause undue alarm." Plaintiff's Exhibit 7.

Dr. Harold Klawans,[1] a board certified neurologist, testified about the terms used to describe the onset of these side effects. He testified that "acute" side-effects are those which occur within about 72 hours from administration of the drug. "Subacute" side-effects occur within a few weeks to a few months and would include drug-induced Parkinsonism or tremors. Finally, those side-effects that occur only after years of drug therapy are known as late-onset or Tardive-type symptoms. Dr. Klawans did testify that in the "exceptionally rare" case, a Tardive-type symptom could occur in about three months time.

Dr. Klawans went on to testify that the PDR in 1963 was warning about acute and

1. Bolen has attempted to exclude the testimony of Dr. Klawans on the ground that he never established that he had "adequately familiarized himself with the standards and practices of" Boise pursuant to Idaho Code § 6–1013. In other words, Bolen argues that Dr. Klawans did not adequately inquire about the local standard of care in Boise between 1963 and 1969. Dr. Klawans did testify that prior to his testimony he had conferred with the President of the Idaho Psychiatric Association, Dr. Larry Dewey.

Dr. Dewey is also a psychiatrist on the staff of the V.A. It is true that Dr. Dewey was not a practicing physician during the period 1963 to 1969. But because Dr. Dewey is the President of the Idaho Psychiatric Association, and because he is on the staff of the V.A., the fact that he was not a practicing physician between 1963 and 1969 affects only the weight of Dr. Klawans' testimony rather than its admissibility. The Court therefore rejects Bolen's attempt to exclude the testimony of Dr. Klawans.

sub-acute side-effects; that is, effects that would manifest themselves within a few weeks to a few months from the administration of the drug. While the 1963 PDR noted that these acute or sub-acute side-effects were promptly reversible, the 1965 PDR warned of acute and sub-acute side-effects that might linger:

> Therapy should be stopped at the first appearance of dystonic and Parkinsonism-like symptoms, since following the administration of some Phenothiazine derivatives there have been rare cases where such symptoms have lasted months and even years.

Here, the 1965 PDR is essentially saying that symptoms that may manifest themselves within a few weeks or months of administration of the drug might last longer than previously suspected. There was, however, no warning in the 1965 PDR that the long term used of Stelazine could cause side-effects that became manifest only after the drug had been taken for many years. The first warning of this type in the PDR occurred in the 1972 supplement which warned of a side-effect known as Tardive Dyskinesia. As discussed earlier, the word "Tardive" refers to late-onset, while the term "Dyskinesia" is a general term meaning abnormal movement or the impairment of the power of voluntary movement. Some typical symptoms of Tardive Dyskinesia include abnormal movements of the tongue, odd positions of the head or jaw, involuntary chewing movements, and a general sense of agitation. Dr. John Davis, a member of the American Psychiatric Association task force on Tardive Dyskinesia, testified that Tardive Dyskinesia generally occurs after several years of Phenothiazine drug treatment. Defendant's Exhibit 108 at p. 20, lines 17–18. Dr. Davis went on to testify about the growing awareness within the medical profession about the link between long term use of Phenothiazine drugs and Tardive Dyskinesia:

> In the early '60's nothing was known about it. And reports started appearing in, I would say, in the mid-'60's. I first became interested in it in the late-'60's. And at that time I became interested in it

because it was highly controversial. Some people said it didn't exist.... During the early '70's I think more people were becoming aware of it. Around '73 there were several editorials relating to it. And there was a lot of discussion in the mid-'70's.

> The American Psychiatric Association formed a task force which published a report in 1980 which indicates at that time the American Psychiatric Association recognized it [the link between Phenothiazine use and Tardive Dyskinesia]. The American Psychiatric Association has become more concerned. And in the late-'80's, around '86 or '87 they sent a letter to all psychiatrists warning them about Tardive Dyskinesia.

> . . . .

> QUESTION (by Government counsel): At what point in time, if you can identify any point specifically would you say that the psychiatric community should have been put on notice of the potential Tardive Dyskinesia side-effect to long term Stelazine or Thorazine [another Phenothiazine drug] use by their patients?

> ANSWER (by Dr. Davis): I don't think there is a single point in time. I think the landmarks would be a relative increasing awareness in the early '70's, the task force report in 1980, and then the letter of warning from the American Psychiatric Association in 1986 would be a gradual increase in concern.

> QUESTION: What if any significance do you attach to the PDR warning of Tardive Dyskinesia in answering that last question?

> ANSWER: I would say the appearance of warning in the PDR would be an index that the FDA was aware of it. The FDA is supposed to monitor side-effects. And warn as soon as possible. So the FDA generally overwarns and warns quickly.

> I wouldn't place the FDA PDR warning as a sort of magical, definitive warning. It's complicated in that the PDR represents a compromise between the FDA as a regulatory agency and the drug industry. And a lot of other pres-

sures other than medical go into the PDR. The general pressure on the FDA is overwarning because they don't want to be caught in a situation where they warn too late.

. . . .

QUESTION: And so would the discussion you have just given us apply to the standard of care as you understand it in the Boise, Idaho community?

ANSWER: I think roughly it would be. But not exactly. Boise being not located in a major medical center, might be a little slower than the rest of the county. But this is a time frame over years. So I would say with that one reservation, that it may take a while for the information to get out, my remarks would hold.

Defendant's Exhibit 108 at p. 23, lines 3–21; p. 26, lines 23–24; p. 27, lines 1–24; p. 28, lines 1–3; p. 29, lines 10–19.

Dr. Klawans basically agreed with Dr. Davis that a practicing psychiatrist—as opposed to a psychiatric researcher or professor—would not have known about the link between Phenothiazines and Tardive Dyskinesia until some time in the 1970's. Dr. Klawans pointed out that the warnings in the PDR in the 1960's dealt with acute or sub-acute effects and that if a patient was observed in the 1960's for three or four months without suffering from any abnormal movements, there would be no reason to suspect the Tardive or late-onset of such symptoms years later.

This testimony was contested by Dr. Nyla Cole, a board certified psychiatrist from Salt Lake City, Utah. She testified that she became aware of the link between Tardive Dyskinesia and Phenothiazines in 1965 while she was an associate professor at the University of Utah, College of Medicine. She then went on to testify as follows:

Allowing for general dissemination of information, I would think it reasonable to expect that doctors in any community did know [about the possible link between Phenothiazine use and Tardive Dyskinesia] by 1968 or '69, but I would not hold them to the '65 time.

. . . .

I won't quarrel with whether it was '68 or '68 or even 1970, but somewhere in that ballpark we were all increasingly aware that we had better be darn careful, okay.

Plaintiff's Exhibit 8 at p. 24, lines 12–14; p. 77, lines 17–19. The testimony of Dr. Jess Groesbeck was in agreement with the testimony of Dr. Cole.

Dr. Eugene Caffey, a former staff and chief psychiatrist at various V.A. hospitals, testified that he assembled and summarized data concerning the use of Phenothiazine drugs which was placed in an article entitled "Drug Treatment in Psychiatry" published by the Veterans Administration in January 1970. Plaintiff's Exhibit 16. At page 12 of that publication, there is a statement that "Recently, clinicians have become concerned over the late appearance of Dyskinesias manifested by [abnormal] movements which do not cease after the drug has been stopped." It also appears that other medical articles appearing in the 1960's did discuss the link between Phenothiazines and late-onset abnormal movements. But as Dr. Davis persuasively testified, a practicing psychiatrist could not be expected to read through the large volume of total articles to come upon these relatively scattered and mostly European articles on Tardive Dyskinesia.

In examining the link between Tardive Dyskinesia and the long term use of Phenothiazine drugs, it is important to remember that there is no university medical school in the state of Idaho, and that even as late as 1972, there was only one board-certified psychiatrist in the entire state. With these circumstances in mind, the Court will now turn to a discussion of the onset and progression of Tardive Dyskinesia in Clarence Bolen.

The plaintiff Clarence Bolen was approximately 78 years of age at the time of this trial. During his earlier years he had been a farmer, operating a dairy farm near Eagle, Idaho. In the winter of 1962 he was struck on the head by a bale of straw. Shortly thereafter he began having blood-clotting problems. His wife at the time,

Patricia Bolen, testified that his moods began to swing wildly after the accident. His temper would flare up unexpectedly and he would have paranoid feelings that people were poisoning his food.

Because Bolen had a ten percent service-connected disability, he was admitted to the Veterans Administration Hospital in Boise, Idaho, in May 1962. He was initially diagnosed as suffering from thrombophlebitis, a blood-clotting disorder. But it became apparent that his main problem was anxiety.

Dr. Chester Stevenson was the V.A. physician treating Bolen for anxiety. Dr. Stevenson testified that he tried two anti-anxiety drugs, Librium and Parnate, without success. These two drugs were not Phenothiazine drugs. On October 12, 1962, Dr. Stevenson prescribed Stelazine for the first time, and it successfully alleviated Bolen's anxiety. Bolen testified that Dr. Stevenson told him that he would have to take Stelazine for the rest of his life. Patricia Bolen testified that Dr. Stevenson told her that Clarence Bolen would "probably" have to be on Stelazine for the rest of his life. Dr. Stevenson testified that it is most unlikely that he made any absolute statement to Bolen, but more likely that he qualified his prediction about long term drug use.

At any rate, Dr. Stevenson stabilized Bolen on two milligrams of Stelazine to be taken three times a day. The expert testimony was unanimous in declaring that this was considered a low dose of the drug. While Bolen was in the hospital at this time, he was monitored by Dr. Stevenson through regular visits. Bolen was discharged on February 1, 1963. *See* Defendant's Exhibit 101 at p. C00273. The clinical diagnosis at the time of discharge included "anxiety tension state, with paranoid features." *Id.* Bolen was discharged "CBOC" which means "completion of bed occupied care." A patient discharged CBOC could return to the medical services unit of the V.A. for follow-up treatment. This would allow continued monitoring of patients, but would also free the use of a bed in the hospital. Once the medical services department of the V.A. had done all it could, a patient would be discharged "MHB" otherwise known as "maximum hospital benefits." An MHB discharge would mean that further monitoring for those with service-connected disabilities like Bolen would be done by the V.A. outpatient clinic, a separate department.

When Bolen was discharged on February 1, 1963, he was given a prescription for Stelazine of two milligrams to be taken twice a day. Dr. Stevenson's discharge notes state that the Stelazine caused a "considerable improvement" in his emotional state. *See* Defendant's Exhibit 101 at p. C00268.

As part of the discharge, Bolen was directed to return February 27, 1963. He was readmitted on February 20, 1963, complaining of chest pains. *See* Defendant's Exhibit 101 at p. C00336. Dr. Stevenson testified that during this hospital stay, Bolen's Stelazine prescription was reduced which indicates monitoring. *See* Defendant's Exhibit 101 at p. C00292. Bolen was discharged on March 11, 1963, CBOC, with directions that he be "followed every few days," Defendant's Exhibit 101 at p. C00335, and that he return on March 14, 1963. Defendant's Exhibit 101 at p. C00322.

On April 12, 1963, his Stelazine prescription was renewed for two milligrams three times a day, and he was directed to return in ten days, which he did. Defendant's Exhibit 101 at p. C00321. On May 20, 1963, he was directed to "keep on ... Stelazine" and to return in two weeks. *See* Defendant's Exhibit 101 at p. C00320.

Bolen was seen by a V.A. physician about every two to four weeks during this period. The next note regarding Stelazine occurs on August 12, 1963, when he was given a prescription for two milligrams of Stelazine to be taken three times a day. Defendant's Exhibit 101 at p. C00318. Bolen was seen again in August, and was discharged MHB on September 18, 1963, with the notation that he "will continue Stelazine [two milligrams three times a day]." Defendant's Exhibit 101 at p. C00317.

The medical records establish that between the first time that Bolen began taking Stelazine on October 12, 1963, and the date of his final discharge MHB on September 18, 1963, he was monitored by V.A. physicians on a regular basis. The Stelazine therapy was very successful in treating his anxiety. Patricia Bolen testified that during the first three years, the Stelazine was quite beneficial in successfully calming him down. Bolen himself testified that the Stelazine was very beneficial. There is no evidence that during the period October 12, 1962, through September 18, 1963, that Bolen suffered any acute or subacute side-effects from the Stelazine.

With his discharge MHB on September 18, 1963, and his service-connected disability, Bolen was entitled to follow-up care at the V.A. outpatient clinic. The custodian of V.A. records, Monica Wilkens, testified that prior to 1975, outpatient records were retained for four years, and that after 1975 the records were retained for three years. She testified that she was unable to locate any V.A. outpatient records for Bolen prior to 1975. This is crucial because Bolen's main claim is that he was not monitored by V.A. physicians between 1963 and the 1970's. The Court finds that there is no evidence that these outpatient records were improperly destroyed.

Bolen's claim that he was not monitored as an outpatient is based primarily upon his own testimony that he regularly obtained Stelazine prescriptions between 1963 and 1969 without being required to see any V.A. physicians. Bolen testified that although he did see V.A. physicians a few times between 1963 and 1969, he could obtain refills of Stelazine at the V.A. pharmacy without a written prescription or a doctor's authorization.

This testimony conflicted with that of Albert Tollinger, presently the Chief of Pharmacy at the Boise V.A. Hospital, and a pharmacist there since 1969. Tollinger testified that the basic pharmacy policy, established in 1955, was that each new request for refill of a prescription had to be accompanied by a written doctor's prescription. In 1962 that policy was changed to allow a doctor to write a prescription good for five refills or one year, whichever came first. The last change to this policy came in 1971 when the one-year period was shortened to six months. If no refills were authorized, the pharmacy could only give out a 30-day supply. Tollinger's testimony that these policies were strictly followed and that no open prescriptions were allowed, was corroborated by Dr. Stevenson who initially prescribed the Stelazine for Bolen in 1962. This testimony was further corroborated by another V.A. psychiatrist, Dr. Charles Marsh. While there was some discussion by Dr. Nyla Cole that the V.A. pharmacies were lax in their procedures, see Plaintiff's Exhibit 8 at p. 82, lines 9–13, it is important to note that she was not discussing the Boise V.A. Hospital and had no experience or contact with that facility. For that reason, the testimony of Dr. Cole on this point carries little weight with the Court.

After examining all the testimony, the Court finds most credible that of Albert Tollinger, Dr. Stevenson, and Dr. Marsh. Bolen's testimony that he had an open prescription is simply not credible. The Court had the distinct impression while viewing Bolen's demeanor on the stand, that he was not being completely straightforward with the court on this issue as to whether he had seen doctors as an outpatient.

The Court does find credible, however, Bolen's testimony—corroborated by others—that he did take Stelazine regularly from 1963 to 1969. But the Court also finds that Bolen would have to regularly visit V.A. physicians during that period to obtain prescription refills.

It appears that the next time that Bolen was hospitalized subsequent to his discharge MHB on September 18, 1963, was in February 1969 when he was admitted as an inpatient to the Boise V.A. Hospital for treatment of thrombophlebitis. It appears that Bolen was hospitalized from February 8, 1969, to February 25, 1969. The notes of V.A. physician Dr. Robert Lewis state that Bolen "continued to use Stelazine [two milligrams three times a day] while in the hospital as he had before admission, and will continue to take this drug after dis-

**1352**

charge." Defendant's Exhibit 105 at p. C00386. Bolen was discharged MHB on February 25, 1969.

The last record of any administration of Stelazine to Bolen by V.A. physicians occurs in April 1969. Bolen was admitted to the V.A. on April 1, 1969, and a "doctor's orders" form notes that a V.A. physician ordered two milligrams of Stelazine to be taken three times a day. Defendant's Exhibit 105 at p. C00393. There is no indication in this hospitalization, or the one in February 1969, that Bolen was suffering from any type of Dyskinesia.

By 1969, there is some indication that Bolen was also being treated by private physicians. In the record there is a letter from Dr. Blackburn, a private physician, to the V.A. indicating that Dr. Blackburn would take over the care of Bolen and needed his V.A. records. *See* Defendant's Exhibit 116. On December 23, 1971, Bolen complained of chest pains and was examined by a private physician, Dr. Ardean Ediger. *See* Defendant's Exhibit 105 at p.003007.

The first indication in the documentary record that Bolen was suffering from Tardive Dyskinesia occurs on September 7, 1972. On that date, Bolen was referred by Dr. Ediger to an oral surgeon, Dr. William O. Houston, after Bolen complained of jaw pain. Dr. Houston's notes indicate that Bolen could "not hold a pipestem in his mouth due to weakness." Defendant's Exhibit 105 at p. 007001. Dr. Houston diagnosed the problem as some type of joint inflammation, and no medication or follow-up was prescribed.

Bolen himself testified that the symptoms came on gradually and apparently began in 1972. He testified that beginning in 1972 he drooled, and had difficulty chewing. His wife testified that by 1973, his jaw would drop down, he would have trouble talking, and that his tongue would move rapidly.

On April 26, 1973, Bolen complained to Dr. Ediger about jaw pain, Defendant's Exhibit 105 at p. 003203, and he was referred to Dr. Michael O'Brien, a Boise neurologist. Dr. O'Brien examined Bolen on

May 7, 1973, and noted that Bolen had been on Stelazine "for twelve years." Defendant's Exhibit 105 at p. 009001. Dr. O'Brien observed that Bolen's tongue moved from side-to-side and his mouth would not close properly. Dr. O'Brien concluded that "what we are seeing today is most likely a Tardive Dyskinesia.... Such a problem is often found with an overdose of Phenothiazines." *Id.* Dr. O'Brien could not remember specifically informing Bolen that he had Tardive Dyskinesia caused by Phenothiazines, but he testified that it was his policy to do so and that it was more likely than not that he so informed Bolen. But most importantly, Bolen himself testified that in 1973, Dr. O'Brien had told him that he had Tardive Dyskinesia caused by Stelazine.

Shortly thereafter, Dr. Michael Estess, a board certified psychiatrist, also concluded that Bolen had Tardive Dyskinesia caused by long term use of Stelazine. Dr. Estess testified that he believes he "probably informed Bolen of this diagnosis in September of 1973." He is "basically sure" he did inform Bolen because he remembered Bolen quite well.

Bolen was hospitalized for four days in August 1973 by Dr. O'Brien and for eight days in March 1973 by Dr. Estess. The diagnosis in both hospitalizations was Tardive Dyskinesia caused by long term use of Phenothiazines. The discharge documents bearing that diagnosis were signed by Bolen or his wife. Defendants Exhibit 103 at pp.200002 and 200005. Bolen testified, however, that there was nothing written on the discharge documents as to diagnosis when he signed them. Both Dr. O'Brien and Dr. Estess kept Bolen on a Phenothiazine drug known as Thorazine. As Dr. Estess testified, doctors must weigh the risks against the benefits when prescribing drugs. The Phenothiazines had been very beneficial for Bolen and Dr. Estess decided to try a less potent form of Phenothiazine by prescribing Thorazine.

Over a year after Bolen had been informed by these two doctors that he suffered from Tardive Dyskinesia caused by long term use of Stelazine, he was admit-

ted to the V.A. Hospital on February 1, 1975, complaining of an inability to close his mouth. Bolen testified that a V.A. physician told him at that time that Bolen definitely did not have Tardive Dyskinesia. The notes of V.A. physician Dr. Klein also indicate Dr. Klein's belief that Bolen's problem was "definitely" not an "extrapyramidal" (drug-related) problem." Defendant's Exhibit 102 at p. C00460.

In subsequent V.A. hospitalizations during the period May 27 through June 20, 1975, V.A. physicians were suspicious of Bolen's ability, when distracted, to speak intelligibly and to apparently be able to close his mouth. These physicians felt that Bolen's problem was stress-related.

In August 1975, Bolen was transferred to the American Lake V.A. Hospital in Washington. There, a Dr. R.S. Dille reasserted the diagnosis of Tardive Dyskinesia. Defendant's Exhibit 102 at p. C00256. Bolen testified that upon hearing this diagnosis, he knew something was wrong and he decided to file a claim against the V.A. which he did on March 29, 1976. Bolen's claim—originally for $100,000 and amended to $1.5 million—alleged that the V.A. physicians prescribed Phenothiazine drugs for him without warning him about the possible onset of Tardive Dyskinesia. The Government asserted that it denied Bolen's claim in 1976 but Bolen denied receiving any notice, and the Government was unable to produce the denial letter as required by law. The Government did, however, produce a later denial letter dated July 29, 1985. Bolen responded by filing this suit on April 2, 1986.

Bolen attempted to amend in this court his claim to increase it to $10 million from $1.5 million. This Court denied that request in a memorandum decision filed October 16, 1986. Thereafter, the Government moved for summary judgment on statute of limitation grounds. This Court found questions of fact existed precluding the issuance of a summary judgment. The matter was set for court trial on November 6, 1989, and evidence was presented during that time.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter under 28 U.S.C. § 1346(b) as the matter was brought pursuant to the Federal Tort Claims Act (FTCA).

█ The first issue faced by the Court is whether Bolen's claim with the V.A. was filed within the appropriate statute of limitations period. The FTCA bars any tort claim against the United States unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues." 28 U.S.C. § 2401(b). The United States Supreme Court has held that a cause of action in a medical malpractice case under the FTCA accrues when "the plaintiff has discovered both his injury and its cause." *United States v. Kubrick*, 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259 (1979). The Ninth Circuit has interpreted *Kubrick* to mean that the "cause" is known when the immediate physical cause of the injury is discovered. *Davis v. United States*, 642 F.2d 328, 331 (9th Cir.1981), *cert. denied* 455 U.S. 919, 102 S.Ct. 1273, 71 L.Ed.2d 459 (1982).

In this case, Bolen filed his V.A. claim on March 29, 1976. If he knew prior to March 29, 1974, that he had Tardive Dyskinesia caused by Phenothiazine drugs, his claim is clearly time-barred. In this case, Bolen did know, by his own testimony, that Dr. O'Brien diagnosed him as suffering from Tardive Dyskinesia caused by Phenothiazine drugs in May 1973. Dr. Estess also informed Bolen of this same diagnosis in September of 1973.

Bolen argues, however, that he was confused by the February 1975 diagnosis wherein a V.A. physician told Bolen that he definitely did not have Tardive Dyskinesia. In May and June 1975 other V.A. physicians told Bolen that his problems were stress-related. Bolen argues that these conflicting diagnoses confused him, and that he was not certain about his injury and its cause until Dr. Dille told him that he had Tardive Dyskinesia in August 1975.

The Ninth Circuit, and other circuits, have held that patients seeking to understand the cause of an injury may reason-

ably rely on advice and assurances by physicians. *E.g., Rosales v. United States*, 824 F.2d 799, 804 (9th Cir.1987; *In Re Swine Flu Products Liability Litigation*, 764 F.2d 637 (9th Cir.1985) (an appeal from a decision of this Court); *Chamness v. United States*, 835 F.2d 1350, 1353 (11th Cir.1988). For example, in the Ninth Circuit decision of *Rosales*, the plaintiff's baby was born in 1982 with lazy eyelids. The treating physicians assured the parents that this condition was innocuous. But four months after the birth, the baby appeared retarded. Doctors attempted during the next year to determine the cause, but it was not until 1984 that plaintiff was told that the retardation was caused by her use of an Intrauterine Contraceptive Device (IUD). While she was pregnant, she had been examined by a Government physician who informed her that her use of the IUD could entail some risks, although it was unclear how specific his advice was. The plaintiff sued the Government for malpractice. The Government moved for summary judgment on the ground the two-year statute of limitation began running on the date of the birth in 1982, because a Government physician had told plaintiff about IUD risks and the baby was born with obviously lazy eyelids.

The Ninth Circuit rejected the Government's argument. The Circuit held that the plaintiff had reasonably relied on the assurances of her doctors that the lazy eyelid problem was not serious. The Circuit went on to hold that the statute of limitations did not begin to run until plaintiff was told that the retardation was caused by the use of the IUD. In *Rosales*, unlike the case before this Court, there were no conflicting diagnoses: In fact, the doctors in *Rosales* did not know the cause of the injury until 1984, and the Ninth Circuit held that "the plaintiff cannot be expected to discover the cause of [her] injury even before the doctors themselves are able to do so." *Id.* at 805.

The principle that a patient be permitted to rely on a physician's assurances must be balanced against the principle that once the plaintiff has been informed of the injury and its cause, he must:

determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort claimants must make. If he fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the [Government] by delaying accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit. . . .

*Davis v. United States, supra*, at 331.

It is established by Bolen's own testimony that Dr. O'Brien told him in May 1973 that he had Tardive Dyskinesia caused by Stelazine. Bolen heard this same diagnosis in September 1973 from Dr. Estess. At this point, by September 1973, Bolen knew of his injury and its cause, and was under the same burden as any tort claimant to determine whether and whom to sue. In making this determination, potential plaintiffs will often receive conflicting opinions. In almost every medical malpractice suit, experts line up on both sides with diagnoses that are in direct conflict, but these conflicts do not change the fact that a definitive diagnosis establishing the injury and its cause has been made.

This case would be much different if Drs. O'Brien and Estess had assured Bolen that he did not have Tardive Dyskinesia, or had given him some other diagnosis. Such circumstances would place this case squarely within the parameters of *Rosales* and its progeny, and would certainly toll the running of the limitations period. But here, Bolen received a definitive diagnosis of Tardive Dyskinesia caused by Stelazine by these two expert private physicians before March 29, 1974. The conflicting diagnoses he obtained from V.A. physicians in 1975, and the corroborating diagnoses he received from Dr. Dille in 1975, are simply the normal byproducts of a potential plaintiff's investigation to determine whether and whom to sue. The Court therefore finds that Bolen's action is time-barred under 28 U.S.C. § 2401(b).

Assuming, arguendo, that Bolen's action is not time-barred, the Court moves on to a discussion of the merits of this malpractice action.

■ The appropriate standard for medical malpractice is established by Idaho law. 28 U.S.C. § 1346(b). The malpractice standard applicable in Idaho in the 1960's is set forth in Idaho Code § 6–1012 and § 6–1013. *See Lapelley v. Grefenson,* 101 Idaho 422, 614 P.2d 962 (1980) (Idaho Code § 6–1013, passed in 1976, did not set up a new malpractice standard but simply codified the already existing caselaw). Under Idaho Code § 6–1012, the plaintiff must affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence that the defendant physician negligently failed to meet the applicable standard of health care practice of the community in which the care was provided at the time that care was given.

■ With these standards in mind, the Court turns to the medical testimony. The testimony of the experts is in agreement that Bolen is suffering from Tardive Dyskinesia caused by long-term use of Stelazine. In addition, even Bolen's expert, Dr. Nyla Cole, agrees that Dr. Stevenson's initial prescription for Stelazine in October 1962 was appropriate. *See* Plaintiff's Exhibit 8 at p. 49, lines 20–25. Bolen argues, however, that the malpractice occurred when V.A. physicians failed to adequately monitor his progress on Stelazine. Monitoring, the experts explained, involves examining the patient periodically to see if the drug is having the desired effects, and to check for any untoward side-effects. While there is no dispute that Bolen should have been monitored, the frequency of that monitoring was subject to debate. Dr. Jess Groesbeck testified that monitoring should occur every three months while Dr. Klawans testified that given the community standards in Idaho in the late–1960's, physicians should monitor their patients on Stelazine every six months to a year.

The frequency of monitoring for a drug's side-effects is dictated in large part by the knowledge about that drug's characteristics. With Stelazine, between 1962 and 1972, physicians were warned in the PDR about acute and sub-acute dystonic and Parkinsonism-like symptoms. The acute symptoms would arise within 72 hours while the sub-acute symptoms would manifest themselves within a week or a few months. These symptoms included muscle rigidity, protrusion of the tongue, swallowing difficulty, motor restlessness, and insomnia. The PDR does not establish the standard of care in a community, but it is a guide along with other factors. The testimony of Drs. O'Brien, Marsh, and Estess is also helpful because all practice psychiatry in the Boise area. Their collective testimony indicates that Boise psychiatrists should have been monitoring their patients on Stelazine for acute or sub-acute side-effects by about 1965. That is, psychiatrists should have watched their patients on Stelazine closely during the first few months of treatment to observe any dystonic or Parkinsonism-like symptoms.

Indeed, Bolen received just such monitoring. The medical records discussed earlier show that between October 12, 1962, and September 18, 1963, Bolen was seen by V.A. physicians on a regular basis every few weeks. Even plaintiff's expert Dr. Nyla Cole testified that the monitoring of Bolen up through September 1963 was appropriate. *See* Plaintiff's Exhibit 8 at p. 55, lines 13–25; p. 56, lines 1–18. In addition, there is no evidence that Bolen exhibited any acute or sub-acute side-effects from his Stelazine use between October 1962 and September 1963.

Thus, the precise issue is whether Bolen was properly monitored between September 1963 and 1969, which is the last year he received Stelazine from the V.A. Hospital in Boise. And it is crucial in resolving this issue to determine whether the Boise V.A. physicians should have been aware of Tardive Dyskinesia in the period 1963 to 1969. If Boise physicians are only accountable for knowing about the acute or sub-acute side-effects, they would have had no reason to keep a close long-term watch over Bolen, because he exhibited none of those symptoms while being closely monitored for almost a year. But if Boise physicians

should have been aware of Tardive or late-onset side-effects, they would have a continuing duty to monitor closely their Stelazine patients because these side-effects might not show up for years.

As previously discussed, Idaho has no medical school and had only one board certified psychiatrist as late as 1972. Dr. Klawans testified that even a great research institution like the University of Chicago had very little knowledge of Tardive Dyskinesia as late as 1971. There is evidence—discussed previously—that Dr. Caffey helped put together an article entitled, "Drug Treatment and Psychiatry" which warned about the late onset of dyskinesias. *See* Plaintiff's Exhibit 16. But this document was not published until January 1970. The PDR did not warn of Tardive Dyskinesia until 1972; the PDR warnings from 1963 to 1969 only discussed acute or sub-acute side-effects. The testimony of Dr. Davis, quoted earlier in this opinion, also indicates that practicing psychiatrists could not be held accountable for knowing about Tardive Dyskinesia until the early 1970's, and Dr. Klawans essentially agreed. As Dr. Davis testified, a practicing psychiatrist in an area like Boise, Idaho, cannot be held to the same standard as a researcher in a leading medical institution. Dr. Davis further testified that while there may have been some medical articles discussing Tardive Dyskinesias in the 1960's, such articles were not widespread and the majority of the research on this was being done in Europe.

Taking into account all the circumstances of this case, the Court concludes that physicians of the Boise V.A. hospital had no duty to monitor Bolen for Tardive Dyskinesia between 1963 and 1969. This does not mean, however, that the physicians had no duty to monitor Bolen whatsoever. As previously discussed, the experts were united that a patient must always be monitored while on Stelazine. Under the circumstances of this case the plaintiff has not carried his burden of showing a lack of monitoring between 1963 and 1969. Bolen himself testified that he did see V.A. physicians during that period although he also testified that he had an open prescription for Stela-

zine. The Court has already found that Bolen's testimony about the open prescription was not credible. The pharmacy had a strict policy between 1963 and 1969 that refill prescriptions could last either five refills or one year, whichever came first. To obtain new prescriptions, Bolen would have to regularly visit a V.A. physician in the outpatient clinic. Bolen did not have any side-effect complaints between 1963 and 1969, and testified that his problems began in the early 1970's. There was no need to monitor Bolen any more closely because he never complained of any of the acute or sub-acute symptoms.

After examining all of the evidence, the Court makes the following findings. First, the Court finds that the plaintiff's claim is barred by the statute of limitations. Secondly, the initial prescription for Stelazine in October 1962 to treat Bolen's anxiety was appropriate. Thirdly, the Court finds that Bolen was regularly monitored by V.A. physicians between October 12, 1962 and September 18, 1963, through regular visits with V.A. physicians which are documented in the medical records. Fourthly, the Court finds that the Boise V.A. physicians should not be held accountable between 1963 and 1969 for knowing that the long-term use of Stelazine could cause Tardive Dyskinesia. But during the period 1963 to 1969, the Boise V.A. physicians did have a duty to monitor Bolen for acute or sub-acute side-effects that were known during that period. Fifthly, the Court finds that Bolen was properly monitored during the period 1963 to 1969 as he had to visit V.A. physicians on a regular basis to obtain refills of his Stelazine prescription pursuant to the strict V.A. pharmacy policies. And sixthly, the Court finds that there is no evidence that Bolen complained of any symptoms of Tardive Dyskinesia between 1963 and 1969.

For all these reasons, the Court finds that the complaint against the Government must be dismissed and that the plaintiff take nothing thereby.